## DURRAH *v.* STATE, 44 Miss. R., 789.

### HOMICIDE.

It is not a valid plea in abatement to an indictment for murder, to allege that the grand jury who found it were an illegal body because they were selected by an illegal board of supervisors; the acts of a board who are only *de facto* such being as valid as to third persons as those of a board *de jure.*

The empaneling of a grand jury is made by statute conclusive evidence of its qualifications and competency; and after it has been organized and sworn, no exceptions can be taken to its legality as a whole, or to the qualifications of its constituent members. Head v. The State, *supra;* and it is not error to refuse the defendant leave to withdraw his plea of not guilty, and to plead in abatement to the indictment, unless he presents matter in abatement, true in point of fact and valid in law.

It is no ground to quash a special *venire* in a criminal case, that one of the persons named in it was not a citizen of the United States; that would have been good cause of personal challenge, or of challenge to the fact, but it is not a defect in the writ.

The cause for which a special *venire* may be quashed must be either some fraudulent misconduct of the officer, or some manifest error in selecting, drawing, and summoning, in violation of law.

That a copy of the *venire* had not been served on the prisoner or his counsel a sufficient time before trial, would be no ground to quash the writ, although it might be ground for postponing the trial until he should have such time; and if he does not object for such a reason, but goes into trial, he will be taken to have waived the objection.

Instructions should have reference to the facts in evidence, and lay before the jury the law applicable thereto; and if the conviction is right on the evidence, and the jury could not have been misled by the instructions to the prisoner's prejudice, looking to the tenor of all the instructions, then the verdict ought not to be disturbed; and it is only when it appears by the whole record that injury has been done or may have been done the defendant, that the court will interfere to correct the error.

Error to the circuit court of Noxubee county. ORR, J.

The defendant was indicted by the grand jury of Noxubee county at the June term of the circuit court, 1870, for the murder of one Lewis Nichols. To this indictment he pleaded not guilty, at the August term, 1870. The special *venire facias* was returned on the 10th of August, and a copy thereof was delivered to counsel for defendant on the 8th. Defendant asked leave to withdraw the plea of " not guilty," and to file a plea in abatement, wherein he alleges that the grand jury were an illegal body, having been drawn and selected by a board of supervisors who were themselves an illegal body, not being residents of the respective beats from which they were appointed; and also for leave to file his motion to quash the special *venire*, because a copy of the same had not been delivered to him or to his counsel one entire day before the day of trial, and because one of the persons summoned on said *venire* was and now is a subject of the queen of Great Britain. These motions were overruled by the court, and the leave asked refused.

It appeared in evidence on the trial that the defendant and the deceased were both freedmen in the employment of Messrs. Kinkead and Gilmer, planters in Noxubee county ; that the defendant was the body-servant of Gilmer, and the deceased, that of Kinkead. The defendant was seen early in the morning, apparently in a great passion, inquiring for the deceased at Kinkead's house, and was told that he was at Harrison's cabin ; he then started for that house, and as some of the witnesses say, his manner as he passed them was exceedingly violent—was muttering curses, &c., and that on getting near Harrison's house, he pulled off his coat and threw it and his hat on the ground, and called for " Lewis," the deceased, " to come out there." That deceased came out, and defendant "pushed him," and said, " Lewis, this matter has got to be settled, or we have got to fight, damned quick." Some words passed between them, and they passed on back in direction of Kinkead's house, defendant leaving his coat and hat where he had thrown them on the ground, defendant bursting open the gate and passing out first; deceased stopped and shut the gate, defendant pushing him in a rude manner as he, deceased, did so. The two passed on about two hundred yards, when the defendant was seen to raise his

hand twice and let it fall towards deceased, when he, deceased, immediately halloed for help, and went in a bent position towards the house, and the defendant immediately turned back towards the cabins in a brisk walk. Witness went to the deceased where he had fallen, at the gate at Kinkead's house, and found him bleeding from a wound in his stomach, which appeared to have been made with a knife or dirk. Deceased died that evening.

The state then asked the court to give certain instructions to the jury, which were accordingly given, to the number of fifteen; but as only the last three were discussed on the argument, they alone are stated here, and are as follows:

13. "If the jury believe from the evidence that Green Durrah provoked a fight with the deceased, having previous malice against him, and in the fight used a deadly weapon, while the deceased was unarmed, and killed the deceased, he is guilty of murder. If, under these circumstances, he killed him without malice, but in the heat of passion, he is guilty of manslaughter."

14. That if the jury believe from the evidence that the defendant killed Lewis Nichols in a mutual combat, having fought with no unfair advantage, and did the killing with a dangerous and deadly weapon, the law is for the state.

15. That no definite time is required for the mind of the slayer to form such a design to take the life of the deceased as would make the killing murder. If the malicious intent was there at the time of the killing, the slayer is guilty of murder.

The charges asked on behalf of defendant to the number of seven were given by the court, but some of them were qualified by the court, to which qualifications the defendant excepted. They are as follows: "That to kill a human being with a premeditated design, the mind must have acted in regard to the killing before the killing was committed, and the mind must have settled down resolved and determined to kill and murder, and that the killing was done with such deliberation and formed design of so doing; and if the jury believe from the evidence that the defendant killed the deceased in a sudden quarrel, without a premeditated and formed design so to do, he is not guilty of murder [qualified], but may be guilty of manslaughter;

and the malice necessary to constitute murder may be formed but an instant before the killing.

To the subsequent charges for defendant the court added this qualification: "If the jury should believe from the evidence that the wife of the deceased, or the witness, Kinkead, gave the defendant a great provocation, or made the defendant exceedingly angry, and the defendant acted on such provocation, or anger, the killing is murder."

The jury found defendant guilty of murder in the first degree; and thereupon he moved for a new trial, which motion was overruled by the court, and exceptions taken. The defendant assigned the following errors:

First. The court erred in giving the charges asked by the state on the trial.

Second. The court erred in making and giving the qualifications to the charges asked for the defendant.

Third. The court erred in overruling the defendant's motion to set aside the verdict, and to grant a new trial.

Fourth. The court erred in overruling defendant's motion for leave to withdraw his plea of *not guilty*, and to file his plea in abatement.

Fifth. The court erred in refusing to quash the special *venire* for the reasons assigned in the motion.

*Jarnagin* and *Rives*, for defendant,

Insisted that it was error to refuse leave to withdraw the plea of not guilty, and to file the plea of plea in abatement. The grand jury who found the indictment was an illegal body, because the board of supervisors who drew and selected it was itself an illegal body, being constituted of members who were non-residents of the beats for which they were respectively appointed.

Again, the court erred in refusing to quash the special *venire*. By Art. 294, Rev. Code, 629, a party indicted for a capital offense has a right to be furnished with a copy of the special *venire*, and list of *those* who have been summoned by virtue thereof, one entire day before the time set for trial. In this case defendant received only a copy of the special *venire*, and

of the list of names drawn *to be* summoned. Neither the letter nor spirit of the statute was complied with in this respect. Again, the defendant had a right to be tried by his "peers," citizens of the United States and of the state of Mississippi. Phillips, one of those *summoned*, was not his "peer"—not a citizen of the United States, nor of the state of Mississippi—but was a subject of the queen of Great Britain.

As to the charges in behalf of the state, from 2 to 7 inclusive, although they may state the simple propositions of law correctly, they are too abstract, and are not applicable to the facts and circumstances of this case; and are not calculated to guide the minds of the jury to a correct determination. The state had made but a single allegation against the defendant, that of murder; and to tell the jury that on a given state of facts "the law was for the state" was tantamount to telling them that the defendant was guilty of murder. And these objections apply with equal force to the qualification to the second charge for the state.

The general qualification at the conclusion of the seventh charge takes from the consideration of the jury everything done by the deceased himself, and what was reported to defendant by the wife of the deceased.

*J. S. Morris*, attorney general.

All the errors complained of are merely formal and technical. None of them relate to the merits. Without attempting to examine *in extenso* the first objection referred to in the argument in regard to the want of legal qualification in one of the members of the board of supervisors by which was selected the grand jury who presented the indictment, it will be sufficient upon that point to apply to the question raised the two statutory provisions regulating one of them, the official acts of *de facto* officers, and the other the organization of, and the time and mode of objecting to grand juries. Revised Code, p. 138, art. 194; ib., 499, art. 131. See also The State v. Borroum, 25 Miss., 203; and see also Rev. Code, p. 613, art. 250.

2. The accused is entitled to a list of the names of the jurors summoned on his special *venire facias*, to be delivered to him

as soon as that list shall be properly made out. If this copy thus required to be served is to be delayed till it be ascertained whether the officer shall find and summon all the persons whose names have been drawn, and then serve a copy of the list on those who have *been summoned*, such a practice will produce great and unnecessary delays. But be this as it may, there are, in the present case, two reasons why the defect, if it be one, cannot avail for the purpose of a reversal:—1st, Because all the provisions of the Code, and all other laws having relation to the mode of selecting, drawing, summoning, and empaneling all juries *are directory merely*, and shall be *deemed legal* after the jury shall have been empaneled and sworn. Rev. Code, 613, art. 250; and 2d, Because no exception was taken, or bill of exceptions tendered upon that particular point in 'the' court below at the time the motion to quash the *venire facias* was overruled; and the objection cannot be made available by excepting to the judgment of the court overruling a motion for a new trial after a verdict of guilty. Hamilton v. The State, 35 Miss., 217. And the *venire facias* is no part of the record, unless made so by bill of exceptions. 37 Miss., 407; Haynie v. State, 32 Miss., 400; Brown v. State, ib., 434.

3. In respect to the exceptions taken to the judgment of the court, in giving and refusing instructions to the jury, and which are somewhat voluminous, it is sufficient, if on the whole they contain a substantially correct exposition of the legal rules and principles applicable to the case, which we submit that they do, when construed as a whole. Mask v. State, 36 Miss., 77; Oliver v. State, 39 Miss., 526; Josephine v. The State, ib., 613.

Simrall, J.:

The first error assigned, is the refusal of the court to permit the defendant to withdraw his plea of not guilty, and plead in abatement to the indictment. The matter in abatement, as set out in the plea tendered, was in substance, that the board of supervisors was illegally constituted, and the grand jury which preferred the indictment, having been selected by it, was an incompetent body. It might be a sufficient answer to say,

that the incumbents of the board were *de facto* officers dis-, charging their functions, and that their acts as such, so far as third persons are affected, are as valid as if they were in office *de jure.* So that if the exception, stated in this proffered plea, was true in point of fact, it would not avail the plaintiff in error. But there is another and more conclusive answer. The em-. paneling of the grand jury is made by statute conclusive evidence of its qualifications and competency. After it has been embodied, sworn and charged, no exception by plea, or otherwise, can be taken to its legality as a whole, or to the qualifica-. tions of its constituent members. Jas. W. Head v. State, MS. opinion, No. 88. It would, therefore, not be error in the court to decline to allow the plea to be filed, when the matter of the plea would be of no benefit to the accused. When the case had progressed to that stage, that according to the practice the time for pleading dilatory pleas had passed, a party cannot ex-. pect, and ought not to ask, that his plea to the merits may be withdrawn, unless he presents matter in abatement true in point of fact, and valid in law. The court, in adjudging upon such an application, favorably to the accused, ought to be satisfied that the plea is sufficient and valid.

Ought the motion to quash the *venire facias* to have been sustained for the reasons stated—1st. That it was not delivered to the accused or his counsel an entire day before the trial? 2d. Because the jurors were not qualified, one of them being a subject of the kingdom of Great Britain, and not a citizen of the United States? The general policy of the jury laws is to discourage exceptions to the entire body of the *venire*, trusting to the examination on *voir dire* into the qualifications and the challenge for cause, and peremptorily, as ordinarily ample means to ensure the selection of an unbiased jury. Hence the statute makes all laws relating to drawing, summoning and empaneling juries directory merely. Art. 142 of the Circuit Court Law. Rev. Code, 501, forbids a challenge to the array except for fraud. Nor shall any *venire facias*, except a special *venire facias* in a criminal case, be quashed for any cause whatever. Array is the whole body of jurors summoned to attend a court, as they are arrayed or arranged on the panel.

Comyn Dig., Challenge B. *Venire facias juratores*, is the writ by which the sheriff causes to come from the body of his county a certain number of qualified citizens, who are to act as jurors in the court. Steph. Plea., 104. A challenge to the array is an irregular form of pleading, by which exception is made to all the jurors upon the *venire*, for some original defect in making the return thereto. 1 Chit. Crim. Law, 537. It must relate to some default or partiality in arranging the panel. Coke Litt., 156, A. The special *venire* was returnable on the 15th day of August, and a copy was delivered to the counsel of the accused on the 8th day of the month, so that one entire day did elapse between the service of the copy and the trial. Shafer v. State, 1 How. 242.

2d. It is no ground for quashing the *venire*, that one of the persons named in it was not a citizen of the United States. That would have been a good cause of personal challenge. It would be a challenge to the polls, and not a defect in the writ. The sheriff was bound to execute the writ according to its command; no discretion is entrusted to him to strike out, or substitute names, or to omit service, because in his judgment particular persons are incompetent jurors. The statute is silent as to the causes for which the *venire facias* may be quashed; it must be either for some misconduct in the officer, which would be fraudulent, or it must be founded on some manifest error committed in selecting, drawing, or summoning the jurors, by not pursuing the law. It is not pretended that there was error in the selection, drawing or summoning of the jurors, nor is partiality or corruption imputed to the officer. If the *venire* had not been served on the defendant in proper time, that would have been good reason to postpone the trial until the accused had the time allowed by law to examine and scrutinize the panel. But it would not be reason for quashing the writ if it were otherwise unobjectionable. As said by the court in Loper v. State, 3 How., 432, " The statute requires (service of copy of *venire*), to enable the prisoner to prepare his defense, and his challenge to the jurors." If he does not object to a trial for this reason, and asks an enlargement of time, he will

be taken to waive the objection. The return of the sheriff is conclusive, unless contradicted. Woodsides v. State, 2 How., 655; and Shaffer v. State, 1 How, 247.

The instructions given to the jury should have reference to the special state of facts in evidence, with a view to lay before them the law applicable to those facts. The doctrine was announced in Wesley v. State, 37 Miss. Rep., 351, that if the conviction is right on the evidence, and the jury could not have been misled by the court to the defendant's prejudice, looking to the tenor of all the instructions, the judgment ought to have been affirmed. The language of the court is: "It is not for every error committed by the circuit courts, in granting or refusing to charge the jury, that this court will reverse. It is only after an examination of the whole record, and when it appears that the party complaining has either been injured, or may have been injured, that this court will interpose and correct the error." We should be very slow and reluctant to disturb the verdict, if the law was correctly expounded to the jury in reference to the main and material facts developed in the evidence, although there may have been error on some point, collateral, and not touching the material and vital merits of the case. Error is predicated of all the instructions given at the instance of the prosecution, but in the argument objection is only taken to the last three. To have in the mind the facts to which they point, it is proper to sum up the leading and undisputed circumstances immediately preceding and attending the killing. The accused, early in the morning, displayed in the yard, and near the dwelling-house of Kinkead, a boisterous, angry humor, directed towards the deceased; most probably excited by some communication recently made to him by a woman. He immediately started in pursuit of deceased, and found him in one of the houses at the quarter. On sight, he, in an angry manner, accosts him with the declaration that this must be stopped, or there must be a fight. The parties walk off some short distance, when the accused stabbed the deceased, from which he shortly after died.

The 13th charge states to the jury, as law, that if the accused

had malice against the deceased, and provoked a fight, and used a deadly weapon, while the deceased was unarmed, and killed the deceased, it is murder. There is no evidence of any violence, or demonstration of violence, by the deceased, at or just preceding the stabbing. The thrust with the dirk-knife was the first and only blow given. There is not the shadow of pretense in the evidence that excuse existed for the use of a deadly weapon. There may have been, and perhaps was, a willingness, on the part of deceased, to go out and fight on equal terms; that is, without arms, for he had none. The jury were warranted in inferring that a resolution had been formed to take life before the fatal blow was struck, and that the stabbing was in pursuance of such purpose. Under the facts in evidence, it matters not whether the accused was in the habit of carrying the dirk-knife, the implement of death, or whether he prepared himself with it for the special occasion. He was the aggressive party. He sought out his adversary, and invited him to the conflict. He employed his weapon on the first onslaught, when in no danger of harm to life or limb; and from the circumstances of its use, the law implies an intent to kill, with malice prepense, because there was neither excuse nor justification. If in sudden provocation parties begin a conflict on equal terms, and when one party is sore pressed and overcome, and at the moment his life is endangered, he may be excused in seizing any means within his reach to ward off the impending danger. But this is only in sudden quarrel and fight, where there is no malice, but momentary passion is the exciting cause. If, however, the one who uses the deadly weapon has that advantage over his enemy, towards whom he has a grudge, or entertains malice, and brings on the fight with the intent to use it to slay his adversary, then it is murder. The 14th charge, as a general proposition, is too broad. It ought to have been accompanied with a statement of the conditions or circumstances which make a killing with a deadly weapon, in mutual combat, criminal, either as murder or manslaughter; but those conditions are so fully stated in the previous instructions, that the jury could not have been misled. The last charge correctly expounds the law on the subject of

malice prepense, or " the deliberate design," in order to consti-
tute a homicide murder.

Wherefore the judgment is affirmed.