## WALKER *v.* STATE

No. 40269          December 17, 1956          91 So. 2d 548

*A. D. Somerville,* Cleveland, for appellant.

*John H. Price, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

LEE, J.

Oliver Lee Walker was indicted for, and convicted of, feloniously receiving stolen property; and from a sentence of three years in the state penitentiary, he appealed.

The State's proof showed that, on November 30, 1955, a trailer owned by Nott Wheeler, in which was loaded about two thousand pounds of his snapped cotton, disappeared from his shed. Several days later, the trailer was found stripped of its wheels and tires. The tires of which Wheeler had kept a record of the serial numbers, were found on the pickup truck of Willie Rogers and the truck of Sammy McNeil. Rogers and McNeil, together with W. T. McCoy, upon an indictment for larceny of the trailer and cotton, pled guilty. These three parties testified as witnesses for the State. They said that they hooked Willie Rogers' pickup truck to the trailer containing the cotton, and sitting under Nott Wheeler's shed, and pulled it over to Oliver Lee Walker's house. They waked him up late at night, and he was present when they transferred the cotton into his trailer. They then drove the empty trailer down the road and got rid of it. McNeil also testified that he did not have a marketing card, necessary in selling cotton, and sometime before this, he had talked to Walker about ginning some cotton for him and that he agreed to do so. Rogers further testified that Walker told him that the gin at Mound Bayou would run on the following Saturday, and that he went to that place on that date, December 3rd; that Walker had ginned that day cotton both on his truck and on the trailer which the three men had loaded with Nott Wheeler's cotton; and that Walker carried a sample to K. D. Smith, a cotton buyer, sold it to him, and gave him, Rogers, $44 and some cents each for himself, for

W. T. McCoy, and for Sammy McNeil. Richard Jones testified that he ginned two bales of cotton, each of the weight of 460 pounds for Walker at Mound Bayou on Saturday, December 3rd.

For the defendant, K. D. Smith testified that he bought two bales of cotton from Walker, paying him with checks, each in the sum of $136.90. It was shown that, on December 5th, Walker paid his account in the amount of $36 to Stephen Lass, who received one of the K. D. Smith checks, and paid to Walker the balance of $100.90 in cash; and that on the same day, Walker, with the other check from Smith, paid an account in the sum of $29.73 to Fred Wilson, who in turn gave him the balance in cash. Several other witnesses testified to this effect: That Walker left his mother's place on December 2nd with cotton in his truck, went by Ollie Adams' place, hooked onto a trailer with about one thousand pounds of cotton in it, and then went to the gin at Mound Bayou. Will Hubbard rode with Walker at the time. All of these witnesses said that all of this cotton was picked and was not snapped.

Loraine Walker, wife of the defendant, denied that anyone waked her husband on the night in question. She said that no cotton, snapped or otherwise, was put in the trailer. She further said that the cotton was not ginned on the day her husband carried it to Mound Bayou, but that he left the trailer, came back home in his truck, and went back the next day. Several witnesses testified that the general reputation of the defendant, as a law-abiding citizen in the community in which he lived, was good.

In his motion for a new trail, the defendant there contended, as he does here, that the verdict was contrary to the evidence and arose from passion, ill will and prejudice against the defendant, who is a Negro.

The three witnesses, who admitted that they stole the cotton and trailer, and by whom the State made out

its case, were Negroes. Although Willie Rogers was cross-examined at length by defense counsel, he adhered firmly to his story and did not vacillate at all. The effect of the brief cross-examination of Sammy McNeil was emphasis rather than discredit of his testimony. The witness W. T. McCoy was not cross-examined at all. In other words, these three witnesses testified positively and without equivocation that they delivered this cotton to the defendant, at his house, between twelve and one o'clock on the night in question. The evidence of the two white witnesses merely established that the trailer and cotton had been feloniously taken, and that the tires of the trailer had been recovered and identified.

But the appellant says that, since K. D. Smith bought two bales of cotton from the defendant and paid him with checks, and these checks were not negotiated until the following Monday, the evidence of Willie Rogers that the defendant gave him the money for himself and the other two men is wholly unreasonable and incredible. However, neither the defendant nor any witness for him testified in denial that the defendant actually paid over money to Rogers. It is not wholly unreasonable that the defendant had money on his person and was able to make payment for the cotton in cash without the use of the checks. The denial by the wife that the defendant received the cotton, and the other evidence in his behalf to the effect that the cotton, which was ginned, came from other sources, were not sufficient to overwhelm the positive and unimpeached statements of the three above-named witnesses for the State.

█ █ The defendant was given the cautionary instruction that the uncorroborated testimony of an alleged accomplice should "be viewed with great caution and suspicion", and should not be improbable or self-contradictory on its face. Dedeaux v. State, 125 Miss. 326, 87 So. 664; Wellborn v. State, 140 Miss. 640, 105 So. 769; State v. Jennings, (Miss.) 50 So. 2d 352; Nichols

v. State, 174 Miss. 271, 164 So. 20; Cole v. State, 217 Miss. 779, 65 So. 2d 262; Pegram v. State, (Miss.) 78 So. 2d 153.

But, after so considering such testimony, of course if it is reasonable, and not improbable or self-contradictory or substantially impeached, it alone may be sufficient to sustain a conviction. Day v. State, (Miss.) 7 So. 326; Wright v. State, 130 Miss. 603, 94 So. 716; Hunter v. State, 137 Miss. 276, 102 So. 282; Abele v. State, 138 Miss. 772, 103 So. 370; White v. State, 146 Miss. 815, 112 So. 27; Matthews v. State, 148 Miss. 696, 114 So. 816; Boutwell v. State, 165 Miss. 16, 143 So. 479; Harmon v. State, 167 Miss. 527, 142 So. 473; Rutledge v. State, 171 Miss. 311, 157 So. 907; Nichols v. State, 174 Miss. 271, 164 So. 20; Carter v. State, (Miss.) 166 So. 377; Creed v. State, 179 Miss. 700, 176 So. 596; Cole v. State, 217 Miss. 779, 65 So. 2d 262; Pegram v. State, (Miss.) 89 So. 2d 846. Here there were three accomplices rather than one. ██ ██ Manifestly there is no substantial basis on which it may be said that the verdict was contrary to the overwhelming weight of the evidence.

██ ██ On this motion, the defendant called a witness and asked him about press reports concerning the trial of a Negro minister in Montgomery, Alabama, arising out of a bus boycott, the expulsion of a Negro woman from the University of Alabama, the passage of an interposition resolution by the Legislature of the State of Mississippi, the issuance of a manifesto by congressmen, protesting against a decision of the Supreme Court of the United States in the school cases, the existence of Citizens Councils in the State of Mississippi, and reports emanating from Mound Bayou in this State. But this witness professed to know nothing about such matters, except such as he had seen in the newspapers. He said that he was an average citizen, and that these reports had not affected him one way or the other. Be-

sides, he said, "I didn't think there was a man on that jury who would take unfair advantage of a Negro because he was here on trial * * * I think they would be just as fair" to a Negro as a white man. Counsel for the defendant, as a witness, admitted that he rested his motion for a new trial on the testimony of the witness, whom he had called. Counsel did not claim that he had talked with people, and, from such interviews, gleaned the existence of a spirit of ill will toward his client. His position seemed to be that it follows from common knowledge that such an attitude has resulted.

It was shown that the witnesses for the State were Negroes, except the two white witnesses who established the corpus delicti and the identification of the stolen tires. Five of the defendant's witnesses were respected white citizens of the community.

The defendant did not assign or contend that there was a systematic exclusion of Negroes from the list of qualified jurors from which the petit jury was drawn. Actually the proof showed that there were fourteen Negro qualified electors in the county, and that the board of supervisors, at the regular April 1955 meeting, when the jury list for the ensuing year was approved, included in the list of potential jurors for the year seven or one-half of the Negroes, who were qualified. Under Section 264, Constitution of 1890, a juror must be a qualified elector and able to read and write. Under Section 241, Constitution of 1890, among other qualifications, to be a qualified elector, the citizen must be duly registered and must have paid on or before the first day of February of the year in which he shall offer to vote all poll taxes legally required of him for the two preceding years. By Section 243 of the Constitution of 1890, the poll tax is used in aid of the common schools. The first two above-mentioned Sections of the Constitution have been implemented by Sections 1762 and 3235, respectively, of the Code of 1942. The board

of supervisors at the April meeting in each year selects and makes a list of persons to serve as jurors in the circuit court. As a guide in doing this, they are enjoined to use the registration book of voters, and select and list the names of ''qualified persons of good intelligence, sound judgment, and fair character.'' Code Section 1766. It is required that the list shall contain not less than two hundred nor more than eight hundred names, unless the judge of the district shall direct that a greater or less number shall be listed. Code Section 1767. The clerk of the board of supervisors is required immediately to deliver to the clerk of the circuit court a certified copy of the list. Code Section 1768. The clerk of the circuit court is required to put the names from each supervisor's district in a separate box or compartment, which must be locked and kept sealed except when juries are drawn. Code Section 1766. From these boxes or compartments, the requisite number of potential jurors to serve at a term of court are drawn. Code Section 1772.

Many years ago both this Court and the Supreme Court of the United States held that Section 241, supra, does not contravene the Constitution of the United States. Sproule v. Fredericks, 69 Miss. 898, 11 So. 472; Williams v. State of Mississippi, 170 U. S. 213, 18 S. Ct. 583, 42 L. Ed. 1012. Besides, the Supreme Court of the United States also held that Section 264, supra, does not discriminate between the races, and is not violative of the Constitution of the United States. Gibson v. State of Mississippi, 162 U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075; Williams v. State of Mississippi, supra. See also Wheeler v. State, 219 Miss. 129, 63 So. 2d 517; certiorari denied 346 U. S. 852.

The action of the clerks of the circuit and chancery courts and the sheriff, after the judge had failed to do so, assembled for the purpose of drawing the venire for an approaching term of court, in taking the slips out of the jury box and spreading them face up on the table

so that they could see the names, and in selecting therefrom the names of those who, they thought, would make good jurors, was not justified by the statutes on jury selection. Reynolds v. State, 199 Miss. 409, 24 So. 2d 781. The opinion cited, Cook v. State, 90 Miss. 137, 43 So. 618, where this Court, in making a detailed analysis of the statutes in reference to jury selection, said: "The Legislature has been very careful to guard the manner of selecting jurors in such way as that it is largely a matter of chance as to who shall compose the jury at any term of the court."

Although the proof showed that no Negro actually served on the jury at the March 1956 term of the court, this was not substantial evidence of discrimination against Negroes. In a large county like Bolivar, with doubtless a full complement of names in the jury boxes, it is obvious that, if the names of jurors were drawn by chance or lot, as contemplated, the chance of drawing the names of the seven Negroes, or any of them, on the jury, was small indeed. The very fact that the board of supervisors placed in the jury box as potential jurors the names of one-half of the Negroes, who were qualified electors in the county, is strong proof that, regardless of previous customs and policies, the board of supervisors was not then engaged in any policy aimed at the systematic exclusion of Negroes from the list of qualified jurors from which grand and petit juries were to be drawn. McGee v. State, (Miss.) 40 So. 2d 160, certiorari denied 338 U. S. 805, 94 L. Ed. 487, 70 S. Ct. 77, rehearing denied 339 U. S. 958, 94 L. Ed. 1369, 70 S. Ct. 977.

The defendant did not seek a change of venue although he might have done so under Section 2508, Code of 1942, which provides as follows: "On satisfactory showing, in writing, sworn to by the prisoner, made to the court, or to the judge thereof in vacation, supported by the affidavits of two or more credible persons, that,

by reason of prejudgment of the case, or grudge or ill will to the defendant in the public mind, he cannot have a fair and impartial trial in the county where the offense is charged to have been committed, the circuit court, or the judge thereof in vacation, may change the venue in any criminal case to a convenient county, upon such terms, as to the costs in the case, as may be proper.''

The proof showed that the defendant employed counsel promptly after his arrest in January 1956, and that such counsel represented him at a preliminary trial, and has since represented him. The names of the venire from which the jurors were selected were available to him, of course, prior to the convening of court, and the names of the jurors on the panels were at least available to him on the Monday before the trial. He raised no question whatever as to the propriety of the venire or the jury until he filed his motion for a new trial. On the contrary he pled not guilty and announced that he was ready for trial. He did not challenge a single juror either for cause or peremptorily. But instead, he accepted the first twelve jurors submitted to him.

Section 1784, Code of 1942, provides in part that: ''* * * after the grand jurors shall have been sworn and impaneled, no objection shall be raised, by plea or otherwise, to the grand jury; but the impaneling of the grand jury shall be conclusive evidence of its competency and qualifications; but any party interested may challenge or except to the array for fraud.'' The above statute was upheld in Dixon v. State, 74 Miss. 271, 20 So. 839, Hill v. State, 89 Miss. 23, 42 So. 380, and State v. Forbes, 134 Miss. 425, 98 So. 844. It has been held applicable even to a defendant who was not advised that any accusation against him was being considered by that body. Head v. State, 44 Miss. 731; Durrah v. State, 44 Miss. 789; Posey v. State, 86 Miss. 141, 38 So. 324, 4 Anno. Cas. 221; Cain v. State, 86 Miss. 505, 38 So. 227. See also Wheeler v. State, supra.

In Flowers v. State, 209 Miss. 86, 41 So. 2d 352, certiorari denied and appeal dismissed in the Supreme Court of the United States May 1, 1950, 339 U. S. 946, 70 S. Ct. 800, 94 L. Ed. 1360, in reconciling the above statute with the decisions of the Supreme Court of the United States on the question of due process, this Court again held that objections, if any, to the qualifications of grand jurors must be made, if at all, before they are empaneled, and not after, unless the accused has been denied the opportunity for doing so. In that case it was shown that, at the time of the return of the indictment, the defendant was represented by an able lawyer; that the defendant had previously given an appearance bond to await the action of the grand pury, and was presumed to have been at court when the grand jury was empaneled; that he had reason to believe that his case would be investigated by the grand jury when it was empaneled; and that he could have obtained information as to the venire from which the grand jury would be drawn eight or ten days in advance of the court term; that after the return of the indictment, he pled thereto, sought and obtained a severance, and presented a motion for a change of venue; and that he then presented motions to quash the first and second panels of the petit juries before filing his motion to quash the indictment on the ground that there had been discrimination against members of the Negro race in the selection of the grand jury. From all of these circumstances, the court necessarily concluded that the accused had not been denied an opportunity to object to the qualifications of the grand jury.

In like manner it must be said that the accused in this case was not denied an opportunity to object to the qualifications of the petit jurors who tried him. On the contrary it must be said that he opened not his mouth against them, but voluntarily accepted them to determine his guilt or innocence. After a jury has been empaneled

and sworn, it is deemed to be a legal jury. Section 1798, Code of 1942.

In McAllister v. State, 147 Miss. 180, 113 So. 179, where the appellant had been sentenced to suffer the death penalty, this Court overruled the complaint of the appellant that he did not have a fair and impartial jury, where he had accepted, without objection, the jury which tried him. See also Carter v. State, 147 Miss. 171, 113 So. 177.

On the necessity for diligence in the selection of jurors, 39 Am. Jur., New Trial, Section 44, pp. 64-65, says: "It is well settled that a party who is aware of any circumstance affecting the qualifications or the competency of a juror is bound to make his objection by way of challenge before that juror is sworn, and if he fails to do so, he is deemed to have waived the objection and cannot, after an adverse verdict, assert it as ground for a new trial; he may not speculate upon a favorable result by withholding his objection until after the verdict is returned, and then when the verdict is unfavorable, move for a new trial. Similarly, if knowledge of the disqualification of a juror is acquired after the jury is sworn, but before verdict, a failure to make objection at the time will amount to a waiver of the right to a new trial on that ground. It is equally well settled that at the instance of a party, a verdict will not be set aside and a new trial granted because a juror was disqualified, when failure to discover the incompetency of the juror or the lack of his qualification is due to the failure of the complaining party to exercise reasonable diligence. Thus, it has been ruled that a failure to make inquiries or to make thorough examination to determine the competency of the juror will amount to a waiver of objection on that ground, except, according to some decisions, where the objection relates to a matter which was not reasonably to have been anticipated. * * * From these principles it follows that to lay a proper foundation for a new trial for cause of this character, it must af-

firmatively be shown to the court that the disqualification of the juror was unknown to the party and his counsel at the time the jury was impaneled and that reasonable diligence was used before the jury was sworn, by inquiry of the juror or otherwise, to ascertain whether such objection to his sitting existed." See also 66 C. J. S., New Trial, Sections 21, 23.

On the failure to object to jurors until after verdict, 31 Am. Jur., Jury, Section 119, p. 647, says: "The general rule is that objection to a juror because of his disqualification is waived by failure to object to such juror until after verdict, whether in a civil or a criminal case. and even with respect to a statutory qualification. Even in a capital case the disqualification of a juror is generally unavailable after verdict. The general rule stated is of special force where it appears that the party complaining was aware of the objection to the juror at the time of the impaneling of the jury, or where such objection could have been discovered by the exercise of ordinary diligence, and it does not appear on the whole case that injustice resulted * * *" See also 50 C. J. S., Juries, Section 251 a. (1), b. and c., and Section 254.

Neither the defendant nor his counsel claimed to know anything about public sentiment in the county. Counsel based his statement as a result of what he called common knowledge, but which was merely his private opinion. This was a far cry from judicial knowledge, which would dispense with the necessity of adducing proof as to matters of common knowledge. Moreover, counsel admitted that he did not say that the defendant could not get a fair and impartial trial in the county.

If the solemn verdicts of juries and judgments of courts are to be set aside and held for naught on a motion for new trial when a defendant speculates upon a favorable result by withholding his objection to a jury until after a guilty verdict is returned, then the enforce-

ment of the criminal laws of this State and nation is at a low ebb indeed. There must be finality at some time. Trifling and long delays, if tolerated, more than anything else, bring the courts into disrepute. Moreover, if, in this kind of case, an attorney for a defendant, after conviction, may express as so-called common knowledge his private opinion that, from newspaper reports, the jury was prejudiced against his client and he did not receive a fair and impartial trial, and such opinion shall be deemed sufficient to set aside the solemn verdict and judgment of the court and entitle the defendant to a new trial, then it is clear that it would be practically impossible, at the present time, to try a Negro for a crime committed in this State.

It is our considered judgment that the trial court was fully warranted in overruling the motion for a new trial. No reversible error appears in the record, and the cause is therefore affirmed.

Affirmed.

*McGehee, C. J.,*and *Hall, Holmes* and *Arrington,* JJ., concur.