CAMERON *v.* STATE

No. 40775 April 28, 1958 102 So. 2d 355

*Emmette P. Allen,* Brookhaven, for appellant.

*J. R. Griffin, Asst. Atty. Gen.,* Jackson, for appellee.

McGehee, C. J.

On the 4th day of March 1957 the appellant J. C. Cameron, a Negro, had been arrested for the crime of rape against Mrs. C. T. Travis on December 18, 1956, and for the crime of rape committed on February 3, 1957, against Mrs. Polly Hales and against Mrs. Euna Mae Johnston, respectively, in the City of Brookhaven, Lincoln County, Mississippi. On the said 4th day of March 1957 a local member of the Lincoln County bar was ap-

pointed by the Circuit Court of the county to defend the appellant against the said charge of the crime committed against the said Mrs. Polly Hales and of the one against Mrs. Euna Mae Johnston, respectively, for both of which the appellant had been indicted, and on March 19, 1957, another local attorney was appointed by the court to assist in the defense of the appellant on the two said indictments, since the accused was unable to employ counsel for his defense in either of those cases.

The three victims of the said crimes were all adult married white women.

While the officers were investigating the crime which had been committed against Mrs. C. T. Travis on December 18, 1956, they arrested the appellant on February 7, 1957, as a suspect of the commission of the said crime, for the purpose of an investigation and comparison of finger prints, etc. After taking the accused into custody, and while transporting him in an automobile from Brookhaven to the office of the Mississippi State Highway Patrol in Jackson, Mississippi, the two highway patrolmen informed the accused upon leaving Brookhaven in the automobile for Jackson that the reason 'that they had taken him into custody was that he was suspected of having committed the said crime against Mrs. C. T. Travis on December 18, 1956, and that they were also investigating the crimes committed against Mrs. Polly Hales and Mrs. Euna Mae Johnston, respectively, on February 3, 1957. Without waiting to be questioned by the said officers he responded to their explanation as to why he had been arrested by saying: "I am the Negro."

It does not appear that while the officers were enroute from Brookhaven to the Mississippi State Highway Patrol Office in Jackson that there was any further discussion of either of the said crimes between the officers and the accused. The distance from Brookhaven to Jackson was approximately 55 miles. When the officers arrived with the accused at the office of the State Highway Pa-

trol in Jackson the accused was first allowed to eat his supper, and soon thereafter, upon the arrival of the sheriff of Lincoln County, the Chief of Police of Brookhaven, and the District Attorney, he made a full, free and voluntary confession in considerable detail of his guilt of the crime against Mrs. Euna Mae Johnston, for which he was later indicted on September 4, 1957, and for which he was tried, convicted and given a death sentence, as fixed by the jury, on September 23, 1957.

Prior to the September 1957 Term of the court, to-wit on March 27, 1957, the circuit judge, upon motion of the defense attorneys, committed the accused to the Mississippi State Hospital for the Insane at Whitfield, Mississippi, in order that it might be determined by the medical staff of the said institution as to whether the accused was then presently sane or insane and as to whether he was sane or insane at the time of the commission of the said crimes on December 18, 1956, and on February 3, 1957, his commitment to the Mississippi State Hospital for the Insane having been only for the purpose hereinbefore mentioned, and in order that if the accused was found to be sane at that time and also at the time of the commission of the alleged crimes, the order of the court provided that ''immediately after the completion of the said examination and report, if the defendant be found presently sane, then and in that event, the defendant shall be returned to the custody of the sheriff of Hinds County, Mississippi, to be dealt with according to law and subject to the further order and judgments of this court.''

The record in the instant case fails to disclose what the report of the staff at the Mississippi State Hospital for the Insane was, but the record does disclose that he was returned to the custody of the sheriff, presumably because they had found the accused to be sane, since it was only in that event that he was to be returned to the custody of the said officer, under the terms of the order

of commitment. The defense of insanity was not inter-
posed by the accused upon the trial of the instant case,
and no contention is made here in that behalf.

The indictment in the instant case was returned by
the grand jury of Lincoln County on September 4, 1957,
as aforesaid. Both of the attorneys appointed for the
defense of the accused were residing at Brookhaven, the
county seat of Lincoln County, while the grand jury was
in session, and at all times from the date of the commis-
sion of the alleged crime on February 3, 1957, and on the
date of the return of the indictment in the instant case
on September 4, 1957.

No challenge was made to quash the panel or to the
array of the jurors either before or at the time the
grand jury was being impaneled at the September 1957
term of the court.

But on September 10, 1957, which was during the sec-
ond week of the September Term of the court, and after
the grand jury had made its report of the indictments
found, the defendant filed a ''motion to quash (the) in-
dictment'', on the ground that the accused was ''an adult
resident citizen of Lincoln County, Mississippi, and a
member of the Negro race. That the indictment returned
against him by the grand jury of Lincoln County, Mis-
sissippi, charges him with the crime of rape committed
on a white lady. That this crime under the laws of the
State of Mississippi carries, if convicted, as a maximum
sentence, the death penalty.''

The motion to quash the indictment further alleged
''that this defendant was indicted by a grand jury drawn
from a venire composed of all white persons, and which
said venire did not have the name of a Negro person
thereon. That there are Negroes in Lincoln County, Mis-
sissippi, qualified for jury service, but notwithstanding
this, none were selected for this venire, and the reason
for this is that for a great number of years previous to
and during this term of court, there has been in said

County a systematic intentional deliberate and invariable practice on the part of the administrative officers of Lincoln County, Mississippi to exclude Negroes from jury lists, jury boxes and jury service; and that this practice has resulted and does now result in the denial of the equal protection of the laws to this defendant as guaranteed by the Fourteenth Amendment to the United States Constitution.''

In support of the motion to quash the indictment the defendant introduced a number of former law enforcement officers of the county, and proved that no Negro had actually served on either the grand or petit juries in the county during a period of more than thirty years, and the prosecution failed to show that any Negroes had been summoned for jury service or served on either of such juries during the said period of time prior to the September 1957 term of the court. But the State did prove on the hearing of this motion to quash the indictment, the method of selecting the names placed in the jury boxes for service for the year 1957 to be as follows: That the circuit clerk furnished to the board of supervisors a list of 3132 male qualified electors from which the individual members of the board were to select a number of those in their respective districts whom they considered qualified for jury service, and return to the circuit clerk a list of those so selected from each supervisor's district. The number selected by the board of supervisors for jury service for that year was 471 male qualified electors. The proof further showed that there were 265 male Negro qualified electors in the county, but there were no marks or other indication on the list of 3132 male qualified electors furnished by the circuit clerk to the board of supervisors to show whether those on the list were white or Negro men.

Section 1762, Code of 1942, provides who are competent jurors. Among the requirements to render a qualified elector eligible for jury service he must be a male citizen,

at least twenty-one years of age, who is a qualified elector and able to read and write, has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within the period of five years and who is not a common gambler or habitual drunkard. In other words, there is a difference between being a qualified elector and being one eligible for jury service. Moreover another statute, Section 1766, Code of 1942, provides that in filling the jury boxes for each year the supervisors shall select the names of those who are men of good intelligence, sound judgment and fair character.

Each of the five members of the board of supervisors testified upon the hearing of this motion to quash that pursuant to the charge of the circuit judge at each term of the court that the supervisors should select men for jury service of good intelligence, sound judgment and fair character, that each of the said supervisors in selecting a sufficient number of men to serve on the juries for the year had rejected the names of numerous white qualified electors and had failed to place their names on the list of names that were to be placed by the circuit clerk in the jury boxes these white male electors whom the supervisors did not deem to meet the qualifications required for jury service; that they applied the same rule to white qualified electors as they did the Negroes in determining whether or not they were men of good intelligence, sound judgment and fair character, and in all respects met the qualifications for jury service provided by law. The circuit clerk who was introduced by the accused, while admitting that prior to that term of court she did not know of any Negro who had actually served on a grand or petit jury, or who had been summoned for such service, during her tenure of office, over a period of approximately twenty years either as circuit clerk or deputy circuit clerk, that there were names of Negroes placed by her in the jury boxes for the year 1957. She took the list of 471 names which had been selected by the super-

visors and furnished to her in March or April 1957 for jury service for the remainder of said year, and by a casual inspection of the list, at the time she was on the witness stand, testified that she then saw the names of at least five Negroes thereon whose names she placed in the jury box prior to the drawing of the grand and petit juries for the September 1957 term of court, and it was her recollection that there were some Negroes other than those five whose names were placed in the jury box at the same time.

Moreover it was shown without dispute that during the September 1957 term of the court, and on the day prior to the hearing of the motion to quash this indictment during the second week of the term, a Negro by the name of N. G. Herring had been summoned for jury service and had appeared in court and had been excused by the circuit judge when he claimed his exemption from jury service as a minister of the gospel.

The chancery clerk testified that each member of the board of supervisors had in March or April 1957 gone over the list of 3132 male qualified electors furnished to them by the circuit clerk and had checked on this list the names of those selected by them for jury service, by putting a check mark opposite their names on the list of 3132 qualified electors. That they selected a total of 471 as being a sufficient number for jury service for the remainder of that year; that there were no indications on the list of 3132 qualifed electors to indicate whether they were white males or Negroes, and that the list of 471 names selected by the members of the board of supervisors for jury service did not contain any indication as to whether they were white or Negro men, and that he as clerk of the board of supervisors returned this list of 471 names to the circuit clerk in order that she might prepare slips containing their names and place the same in the jury boxes.

 █ The proof made on behalf of the State that the jury list had been made up by the members of the board

of supervisors solely on the basis of their qualifications for jury service, and not on the basis of race, was wholly undisputed, except by the inference from the circumstance that in the years past no Negro had been summoned or had served on either the grand or petit juries. This last mentioned fact of no Negro having served as a juror during the years complained of applies with equal force in a large majority, if not all, of the eighty-two counties of this state. However, since the decision of the United States Supreme Court in the case of Patton v. Mississippi, 332 U. S. 463, 92 L. Ed. 76, 68 S. Ct. 184, it is a matter of common knowledge that the members of the board of supervisors in most, if not all, of the counties of this State have been placing the names of some Negroes in the jury boxes each year, such of those who meet the requirements of being men of good intelligence, sound judgment and fair character and who do not posess the disqualifications enumerated in Section 1762 of the Miss. Code of 1942 as to who are competent jurors. They are not required to place in the jury boxes the names of all the Negroes who meet these qualifications, since they do not now and have never placed in the jury boxes for any one year the names of all of the white men who meet these qualifications, and it is not contemplated that they should do so since all of them are not needed for jury service during any one year.

 It was stated in the opinion in Patton v. Mississippi, supra, that: ''Whether there has been systematic racial discrimination by administrative officials in the selection of jurors is a question to be determined from the facts in each particular case.''

 In the instant case the trial judge, who was born and reared in the City of Brookhaven, where he still resides, is naturally well acquainted with these members of the board of supervisors who testified under oath that they rejected the names of numerous white male qualified electors for jury service on the ground that

they did not possess the qualifications required therefor, and that they rejected the names of Negroes for the same reasons, and not on account of race, in an effort to get good jurors in furtherance of the proper administration of justice in the courts, and we are not prepared to say that the trial judge in passing upon the issue of fact presented by this motion to quash the indictment, was manifestly wrong in his conclusion that there had been no systematic, intentional, deliberate discrimination on account of race. It is a well settled rule, and one which is uniformly followed by this court, that the decision of a trial judge on an issue of fact will not be disturbed on appeal unless it is clear that he is manifestly wrong.

 █ The trial judge heard under a reserve ruling all of the testimony introduced on the motion to quash the indictment, and based his conclusion to overrule the motion upon that testimony, notwithstanding the objection of the District Attorney to the competency of such testimony, the objection being based upon the ground that this Court has repeatedly held that in the absence of fraud, which is not alleged in the instant case, the accused must challenge the array or panel before or at the time the grand jury is being impaneled.

Section 1784, Code of 1942, provides that: ''Before swearing any grand juror as such, he shall be examined by the court, on oath, touching his qualification; and, after the grand jurors shall have been sworn and impaneled, no objection shall be raised, by plea or otherwise, to the grand jury; but the impeneling of the grand jury shall be conclusive evidence of its competency and qualifications; but any party interested may challenge or except to the array for fraud.''

 █ In the case of Flowers v. State, 209 Miss. 86, 41 So. 2d 352, the court held that under the foregoing statute objections to qualifications of grand jurors must be made, if at all, before such jurors are impaneled, unless accused is denied the opportunity for doing so. In

the instant case the accused was in jail during the session of the grand jury throughout the previous week, and both of the defense counsel resided at Brookhaven, as hereinbefore stated, and there was no denial of an opportunity for the accused to have interposed a motion to quash the panel or challenge the array of jurors at the time the grand jury was being impaneled, and it is not claimed that no opportunity was afforded to the defense for making the motion to quash the indictment at the time required by the said Section 1784, Code of 1942.

In the later case of Walker v. State, (Miss.) 91 So. 2d 548, said Section 1784 was upheld and the Court cited therein the following cases: Dixon v. State, 74 Miss. 271, 20 So. 839; Hill v. State, 89 Miss. 23, 42 So. 380; and State v. Forbes, 134 Miss. 425, 98 So. 844. Moreover this statute has been held applicable even to a defendant who was not advised that any accusation against him was being considered by the grand jury. Head v. State, 44 Miss. 731; Durrah v. State, 44 Miss. 789; Posey v. State, 86 Miss. 141, 38 So. 324; Cain v. State, 86 Miss. 505, 38 So. 227. ▮▮▮ In the instant case the accused had been in jail awaiting the action of the grand jury from the date of his arrest on February 7, 1957, until this indictment was returned against him on September 4, 1957, and he had every reason to believe that the charges against him, and for which he was being held in jail, would be investigated by the grand jury when it was convened.

In the case of Walker v. State, supra, the Court further said: "In Flowers v. State, 209 Miss. 86, 41 So. 2d 352, certiorari denied and appeal dismissed in the Supreme Court of the United States May 1, 1950, 339 U. S. 946, 70 S. Ct. 800, 94 L. Ed. 1360, in reconciling the above statute with the decisions of the Supreme Court of the United States on the question of due process, this Court again held that objections, if any, to the qualifications of grand jurors must be made, if at all before they are empaneled,

and not after, unless the accused has been denied the opportunity for doing so. In that case it was shown that, at the time of the return of the indictment, the defendant was represented by an able lawyer; that the defendant had previously given an appearance bond to await the action of the grand jury, and was presumed to have been at court when the grand jury was empaneled; that he had reason to believe that his case would be investigated by the grand jury when it was empaneled; and that he could have obtained information as to the venire from which the grand jury would be drawn eight or ten days in advance of the court term; that after the return of the indictment, he pled thereto, sought and obtained a severance, and presented a motion for a change of venue; and that he then presented motions to quash the first and second panels of the petit juries before filing his motion to quash the indictment on the ground that there had been discrimination against members of the Negro race in the selection of the grand jury. From all of these circumstances, the court necessarily concluded that the accused had not been denied an opportunity to object to the qualifications of the grand jury.''

 The statute as to when objections to the competency of a grand jury shall be raised, relates to a matter of state procedure, but no good reason can be assigned as to why a sovereign state may not enact a valid statute to the end that the efficient and orderly administration of justice may be attained, and without unnecessary and added expensive delay. Otherwise an accused could wait until after a county had gone to the expense of having summoned and convened at court a large number of special veniremen from which the petit jury is to be selected, this is to say, he could wait that late to file his motion to quash the indictment, assuming that the State has no authority to fix a time at which a motion to quash an indictment should be reasonably filed.

 █ But aside from the question as to whether or not the motion to quash the indictment in the instant case

came too late, we are of the opinion that we would not be justified in reversing the decision of the trial judge upon the proof heard by him under reserve ruling thereon at the hearing of the motion to quash the indictment, which was filed after the grand jury had returned the indictment and adjourned. The proof on behalf of the accused on the motion to quash the indictment did clearly establish the fact that no Negro had served on a grand or petit jury in Lincoln County for a period of 30 years prior to the return of this indictment, but that fact alone is insufficient to invalidate the indictment. When this prima facie case was made by the accused under the holding of the case of Patton v. Mississippi, supra, the State in the instant case recognized that the burden had shifted to it to show that the failure to place the names of more Negroes in the jury boxes of Lincoln County for the year 1957 than were placed therein, was on some ground other than because of race, and the trial judge, who heard the testimony and decided this issue of fact, was of the opinion that the failure to place the names of more Negroes in the jury boxes was due to the same fact that the names of numerous white qualified electors were rejected in the selection of the names to be placed in the jury boxes for that year—an effort to select only men of good intelligence, sound judgment and fair character.

If the fact alone that no Negro may have served on a grand or petit jury in any county in this State during the past 30 years is to invalidate every indictment returned against a Negro for an offense against a white person; then the question presents itself as to when the circuit courts in this state may begin to have valid indictments returned. The precise question before us is not whether in years past there has been racial discrimination in the selection of jurors, but rather whether a systematic intentional deliberate and invariable practice of excluding the names of Negroes from jury lists, jury boxes and jury service was being followed at the time of the fill-

ing of the jury boxes for the year 1957. The record in the instant case discloses the fact that the names of Negroes are being placed in the jury boxes, and shows that the members of the board of supervisors are applying the rule as to whether or not the qualified electors met the requirements for jury service to both white and Negro men alike.

In the case of Seay v. State, 212 Miss. 712, 55 So. 2d 430, the record disclosed that the name of no Negro had been placed in the jury box out of which the grand and petit juries had been drawn for the last 50 years. The testimony of the officers in that case, as pointed out in the opinion by this Court, ''failed to disclose any reason for the absence of the names of Negroes in the jury boxes.'' Such is not the case in the record now before us. We conclude that there was no error committed by the trial judge in overruling the motion to quash the indictment in the instant case, both on the ground that the motion came too late, and also on the ground that the trial judge was amply warranted in accepting as true the testimony offered by the State to show that numerous white qualified electors were excluded from the jury list for the same reason that Negroes were excluded therefrom.

 ██ The next assignment of error is that the trial court erred in not holding that the State of Mississippi failed to prove the corpus delicti. On the night of the commission of this crime the victim was at home alone, awaiting the return of her husband from bird hunting. It was after dark on February 3, 1957, when he arrived. Immediately prior thereto, according to both the testimony of the prosecutrix and the written confession of the accused, he entered her home, picked up a paring knife from a table, and advanced on her. A struggle ensued during which she knocked the knife out of his hand and onto the floor. They then clinched and fell to the floor, when the accused took his own knife out of his

pocket and cut her throat. The prosecutrix testified that when she regained consciousness he was on top of her and raping her; that he then committed further violence against her and that when she again regained consciousness her clothing had been pulled up around her waist. He had left her home, and her husband and his hunting companion soon arrived and took her immediately to the hospital where she remained for a period of 24 days. A nearby neighbor heard the victim hollering and screaming immediately before the arrival of her husband and his hunting companion. At the hospital Doctors Crawford and Robbins attended her in the emergency room, where Dr. Robbins says that he made the necessary examination to ascertain whether or not there were any signs on her person of her having been raped, and that not seeing any such signs by this incomplete examination the doctors concluded that it was unnecessary to make a further and more complete examination to determine definitely whether or not the crime had been committed. Dr. Crawford was out of the State at the time of the trial and it was stipulated by counsel for the defense and for the State that if Dr. Crawford were present that he would testify that no physical examination was made of her to the extent of determining whether or not the crime had been committed. She did not complain to either of the doctors that this crime had been committed against her, but this is explained by the fact that she was in a critical condition and that the doctors were concerned in trying to save her life during that night. They had advised her and her husband that she should not be permitted to talk on account of the condition of her cut throat. Therefore it was not until the next morning that her husband ascertained from her that such a crime had been committed by her assailant. Objection was made to the competency of the testimony of her husband as to what she told him on the next morning, and the objection to the admission of his testimony in that behalf was overruled. Assuming that this was error we do not think that it

constituted reversible error under all of the facts and
circumstances of the case, since the accused corrobataed
her testimony in detail in his confession, which was taken
down by a stenographer at the office of the Mississippi
State Highway Patrol, in the presence of two patrolmen,
the sheriff of Lincoln County, and the Chief of Police of
the City of Brookhaven and also in the presence of the
District Attorney. There was no material discrepancy in
the version given by the victim on the witness stand at
the trial and that given in the confession of the accused.
The physical condition of the throat of the victim, and
the other testimony fully explained the failure of the
victim to have made specific accusation against the ac-
cused on that night.

This Court has repeatedly held that where
there is a free and voluntary confession of the accused,
the proof of the corpus delicti is not required to be as
strong as it must be in the absence of a confession.
The third and fourth assignments of error are the ad-
mission of the above mentioned testimony of the husband
of the victim, and the admitting into evidence of the con-
fession of the accused. We do not think that either the
second, third or fourth assignments of error are well
taken.

It is next complained that the trial court erred
in admitting in evidence the bloody clothing of the prose-
cutrix. We think that there was no error in admitting
such evidence as a part of the res gestae and also to cor-
roborate the testimony of the prosecutrix when she said
that upon regaining consciousness she found that the
stride of her panties had been torn, and that she had dis-
covered this to be true before she was carried to the hos-
pital. The proof disclosed that after she arrived at the
hospital some of her clothing was torn off in the emer-
gency room upon the instructions of the attending phy-
sicians.

Finally it is assigned as error that the trial
court should have sustained the motion of the accused

to enter a mistrial and quash the special venire on the ground that one of the veniremen volunteered the statement in the presence and hearing of the others, or in the hearing of several of them, that it was the opinion of the prospective juror that the accused "was automatically guilty". The trial judge had instructed the jurors at the beginning of their voir dire examination not to volunteer any statements in regard to their opinions, and he sent this particular juror to jail for having violated such instruction. He then interrogated all of the other veniremen as to whether or not they could disregard this expression of opinion by this particular veniremen and base their verdict solely upon the testimony that they should hear on the trial of the case and under the instructions that would be given by the court as to the applicable law. They all answered this question in the affirmative. Section 1763, Code of 1942, which has been the law of this state since 1880, provides that "Any person, otherwise competent, who will make oath that he is impartial in the case, shall be competent as a juror in any criminal case, notwithstanding the fact that he has an impression or an opinion as to the guilt or innocence of the accused, if it appear to the satisfaction of the court that he has no bias or feeling or prejudice in the case, and no desire to reach any result in it, except that to which the evidence may conduct; * * * ". The jury selected met the requirements of this statute.

Moreover the judge had theretofore quashed the first special venire, and dismissed from service in the case the numerous jurors summoned, because one of them had stated that he had an opinion, since the defendant "had admitted the crime". We think that the trial judge exercised the utmost caution to see to it that the accused obtained a fair and impartial trial.

We think that the verdict of the jury was amply sustained by competent evidence, and that no reversible error was committed upon the trial. No contention

is made that the confession of the accused was obtained by coercion, threats or promises of reward. The defendant's confession was not only free and voluntary, but the same was corroborated by the fact that the defendant claimed that he had left the yellow-handle knife with which he cut his victim's throat with ''Mother Walker'', where an officer found it, and it was introduced in evidence and the defendant did not testify in his own behalf.

 The only attack made upon the confession of guilt is the contention that this 22 year old Negro, who was an employee of a filling station at the time of the commission of the crime, had attended school between the ages of 6 and 18 years and had been unable to advance further than the fifth grade at school, he having advanced only one grade in each two or more years of his attendance at school, and that therefore he was a person of low mentality, although not insane or incapable of distinguishing between right and wrong. But it is not shown with what regularity he attended school during the sessions that he was enrolled as a student. Precisely, the contention is that the confession should not have been admitted for the reason that the defense claimed that he would not have been capable of understanding and comprehending, or of making a sustained and continuous recital in his confession of the incident, which the confession discloses had transpired at the scene of the crime. We think that all of this raised an issue of fact for the determination of the jury, and that the jury was amply warranted from all of the facts and circumstances of the case in finding that he was accountable for his crime. The accused was ably represented by counsel who are to be commended for their faithfulness and fidelity in the handling of his defense.

The verdict of the jury upon which the judgment and sentence to death was rendered should be affirmed.

Affirmed and Wednesday, May 28, 1958, is hereby fixed as the date for the execution of the death sentence in the manner provided by law.

All Justices concur.