Matthew WINTERS, Petitioner-Appellant,

v.

Thomas D. COOK, Superintendent of The Mississippi State Penitentiary, Respondent-Appellee.

No. 71-3323.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1973.

Rives, Senior Circuit Judge, with whom Brown, Chief Judge, concurred in part and Goldberg, Circuit Judge, concurred, dissented and filed opinion.

Godbold, Circuit Judge, with whom Brown, Chief Judge, and Wisdom, Circuit Judge, concurred, dissented and filed opinion.

Brown, Chief Judge, dissented and filed opinion.

Roy S. Haber, George Beach Taylor, Jackson, Miss., James Robertson, Washington, D. C., for petitioner-appellant.

A. F. Summer, Atty. Gen., Guy N. Rogers, Asst. Atty. Gen., Jackson, Miss., for respondent-appellee.

Before BROWN, Chief Judge, RIVES, Senior Circuit Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

CLARK, Circuit Judge:

The factual circumstances of Winters' crime and the procedural context in which his subsequent guilty plea was entered are set out in detail in the district court's opinion, published at 333 F.Supp. 1033, and need not be reiterated at length here. Winters was indicted by the Grand Jury of Holmes County, Mississippi, on a charge of murder arising out of the shooting death of one E. T. Branch. On the advice of retained counsel Winters pled guilty to that charge and was sentenced to life imprisonment. Winters now seeks federal habeas relief alleging that Negroes were illegally excluded from the grand jury which indicted him, that his guilty plea was not voluntary and intelligent, and that he was denied effective counsel.

### The Grand Jury Discrimination Claim

Based upon two separate but factually interrelated legal theories we hold that Winters may not assert the alleged grand jury discrimination as a grounds for habeas relief. First, his counsel's actions constituted a valid waiver to all objections to the composition of the grand jury, and second, Winters' guilty plea foreclosed his assertion of that constitutional claim.

■ *Waiver by Counsel*—As the court below found on clear record evidence, Winters' attorney fully considered the possibility of raising constitutional objections to the racial composition of the grand jury, but rejected that course of action in favor of a plea of guilty. By such a plea his client was assured of receiving the prosecution's recommendation of a life sentence (with the possibility of a parole after serving ten years), thus avoiding what counsel reasonably considered was the distinct possibility of the death sentence. Counsel testified that the threat of his urging these constitutional objections to the jury selection procedures was the "pry pole" that he used in getting the state to allow the defendant to enter a guilty plea. In his opinion as an experienced criminal attorney this procedure utilized the unlawful condition in the most effective way. Even the most skillful trial tactician should be hard pressed to fault counsel's considered and conscientious strategy to waive this option in return for practical assurance that his client would not be executed. Where, as here, a competent attorney who is well-versed in the defense of murder charges deliberately refrains from making a known constitutional objection to the composition of a grand or petit jury for strategic purposes, there has been a deliberate by-pass and waiver under Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

■ The effect of this waiver was not vitiated by the attorney's failure to consult with Winters about the constitutional objections to the jury composition. As *Fay* points out, "[a] choice made by counsel not participated in by the petitioner does not automatically bar relief." 372 U.S. at 439, 83 S.Ct. at 849. The implication of this last statement—that some strategic decisions which entail the waiver of a constitutional right may be made by counsel without consultation with the accused—was made express in

Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965):

> Although trial strategy adopted by counsel without prior consultation with an accused will not, *where the circumstances are exceptional*, preclude the accused from asserting constitutional claims, see Whitus v. Balkcom, 333 F.2d 496 (5th Cir. 1964), we think that the deliberate bypassing by counsel of the contemporaneous-objection rule as a part of trial strategy would have that effect in this case.

379 U.S. at 451–452, 85 S.Ct. at 569 (emphasis supplied). *Henry* requires inferior federal courts to determine whether the circumstances of a particular case are in the *exceptional* category from which the bar of waiver, created by the good faith actions of a criminal defendant's attorney, has been lifted.

The majority opinion of the panel that originally decided this case, which we today reverse, would have created a per se rule that even an intentional, strategic waiver by a lawyer of his client's constitutional rights cannot be binding. Specifically, the opinion stated:

> Both the State courts and the district court in this case held that Winters' plea of guilty waived his right to complain of the array of jurors in Holmes County. The rationale for such view is that Winters' lawyer knew of the right and that by failing to raise the objection counsel effectively waived the right for Winters. *But it is axiomatic that Winters is the one who must make the waiver, not his attorney.* Winters had no idea that he could object to the jury composition. Before a waiver can be effective it must be knowingly given. Since Winters had not been informed of the

right, his waiver did not encompass its relinquishment.

466 F.2d at 1395–1396 (emphasis supplied). Under this reasoning, the exception which *Henry* explicated would have swallowed the basic rule on which it is engrafted. "Axiomatic" or not, this syllogism—that since the rights are those of the defendant, he alone may waive them—must be rejected. To require an explanation of only the most important rights which arise during the course of a trial, with the advantages and disadvantages of raising each issue, in terms that would enable a defendant to make an intelligent and knowing waiver creates a heavy enough burden for both clients and lawyers. We refuse to enlarge the attorney's duty to include the responsibility to inform the defendant of every possible constitutional claim. *See* Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1110–11 (1970).[1]

Our concern here is more basic than the effect of such a rule on already crowded court dockets; it is that the rule contended for by Winters would make it virtually impossible to conduct a criminal trial in the future. Looking past the disruptive effect on counsel and the confusing impact on the defendant himself, it would be a futile command to require that a trial judge continually satisfy himself that the defendant was fully informed as to, and in complete accord with, his attorney's every action or inaction that involved any possible constitutional right.

Our Constitution has been held to afford all criminal defendants the right to counsel. The cardinal precept upon which the establishment of this right is predicated is that most defendants are

---

1. Particularly is this true where, as here, the defendant is illiterate. On facts somewhat similar to the ones in the case at hand, this court has said:

> [I]t is unrealistic for this court to attach significance to the presence or absence of consultation of the attorneys with the defendants and the presence or absence of

express consent by the defendants to the so-called waiver.

Whitus v. Balkcom, 333 F.2d 496, 503 (5th Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). *See also* Cobb v. Balkcom, 339 F.2d 95, 101 (5th Cir. 1964).

untutored in the law and are unqualified to conduct their own defense. It would be incongruous to reflexively allow a defendant such as Winters to void his conviction when his privately-employed lawyer did what he was retained to do—use his skill and knowledge of the law to further the best interests of his client —because the lawyer did not first reason out his every action with his client and obtain his knowing agreement.

Though there are instances where a defendant's personal waiver is required, our examination of the facts of this case in search of the exceptional circumstances required by Henry discloses no such personal waiver right was present here. Case law demonstrates that the exceptional circumstances which justify a requirement that the defendant personally waive the right vouched-safe may be grouped in two broad categories: first, where there is evidence of fraud, or gross negligence or incompetence on the part of the defendant's attorney; and, second, where an inherently personal right of fundamental importance is involved.

As to the first category, there is absolutely no evidence in this record that the attorney for the defendant did anything other than to conscientiously represent the defendant to the best of his ability. As discussed *infra*, there is no substance to any charge of incompetence or negligence in this case. Thus, we need discuss here only Winters' attack on the good faith of his selected attorney, based on his interpretation of the language in United States ex rel. Goldsby v. Harpole, 263 F.2d 71, 82 (5th Cir.), cert. denied, 361 U.S. 850, 80 S.Ct. 109, 4 L.Ed.2d 89 (1959), where this court stated:

> As Judges of a Circuit comprising six states of the deep South, we think that it is our duty to take judicial notice that lawyers residing in many southern jurisdictions rarely, almost to the point of never, raise the issue of systematic exclusion of Negroes from juries.

This language from *Goldsby* has in subsequent cases been construed to support the proposition that this court must take judicial notice that white lawyers in this circuit almost always will sacrifice their Negro clients' rights to be tried by a constitutionally selected jury out of a fear of community opprobrium or social ostracism. Whether such judicial notice was court recognition of adjudicative facts or of legislative facts, *see* K. Davis, Administrative Law Treatise § 15.03 (1958), the majority of the court en banc now announces that it does not consider such breach of trust by counsel to be so prevalent in any jurisdiction of this circuit that this court should, in the absence of proof, place all or even some lawyers in this circuit under the cloud of such an accusation. Winters, and those raising a similar defense in the future, may not rely on any court to "notice" without proof that attorneys in this circuit are not to be trusted to make a strategic or tactical decision to challenge unconstitutional jury discrimination. When the record discloses that an attorney has deliberately waived a right his client may have had to raise an objection to the racial composition of a grand or petit jury, this court will not, in the absence of proof, assume that the attorney breached any obligation to his client.[2]

*Goldsby* excused a timely failure to object to an illegally constituted

2. Here Winters has made no showing at all that the attorney's decision was in any way motivated by other than a desire to save his client's life. Indeed, what evidence there is more refutes than proves any contention that the attorney refrained from challenging the grand jury out of a fear of social, extralegal pressures. The district attorney, an elected official much more sensitive to community reaction than petitioner's attorney, was persuaded by the attorney's willingness to use this possible defense to intercede with the court for a guilty plea and a prison term sentence in an easy-to-prove case of cold-blooded interracial murder.

petit jury based upon a recognition that the lawyer had been presented with a Hobson's choice between accepting an improper jury and raising a challenge only to secure to his client the right to be tried by a properly chosen venire which was prejudiced by the attack on "the system." This reasoning, which is valid whenever such probable prejudice could be demonstrated to exist, is inapplicable to the facts here. *Goldsby* itself recognizes that while the Hobson's choice will excuse an attorney's failure to timely object to an illegally constituted *petit* jury it will not excuse a failure to object to the racial composition of a *grand* jury. 263 F.2d at 80–81, 84. *See* Whitus v. Balkcom, 333 F.2d 496, 501–502 (5th Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). *See also* Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). In the case at bar we need not reach the petit jury issue either. Winters' counsel never faced this choice. His decision to use the potential of raising such an objection to assure his client safe passage past the hazard of a death

sentence obviated any need to make the "grisly choice" as to the jury he did not face. Therefore, we need not decide whether the "Hobson's" problem had dissipated at the time of Winters' plea [3] or whether it persisted until such time when Negroes were regularly called for jury duty in the county.

Since it is clear that there is no evidence here of breach of trust, fraud, or overreaching, and since we hold that Winters' counsel was neither negligent nor incompetent, this case does not fall within the first branch of exceptions to the general rule that personal waiver is not required.

■ It does not fall within the second branch of exceptions either. It is not such an inherently personal fundamental right that it can be waived only by the defendant and not by his attorney. Such personal fundamental rights include the right to plead guilty (which of course encompasses the waiver of numerous rights), the right to waive trial by jury, the right to waive appellate review and the right to testify personally.

3. An examination of reported decisions of the Mississippi Supreme Court reveals that such objections were not uncommon in Mississippi courts prior to petitioner's guilty plea. Gibson v. State, Miss., 17 So. 892 (1895), aff'd, 162 U.S. 565, 16 S.Ct. 804, 40 L.Ed. 1075 (1896); Smith v. State, Miss., 18 So. 116 (1895), aff'd, 162 U.S. 592, 16 S.Ct. 900, 40 L.Ed. 1082 (1896); Williams v. State, Miss., 20 So. 1023 (1896), aff'd, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012 (1898); Dixon v. State, 74 Miss. 271, 20 So. 839 (1896); Lewis v. State, 91 Miss. 505, 45 So. 360 (1908); Farrow v. State, 91 Miss. 509, 45 So. 619 (1908); Pearson v. State, 176 Miss. 9, 167 So. 644 (1936); Moon v. State, 176 Miss. 72, 168 So. 476 (1936); Patton v. State, 201 Miss. 410, 29 So.2d 96, rev'd, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Gipson v. State, 203 Miss. 434, 35 So.2d 327, 36 So.2d 154 (1948); McGee v. State, 207 Miss. 120, 40 So.2d 160 (1949), cert. denied, 338 U.S. 805, 70 S.Ct. 77, 94 L.Ed. 487 (1950); Flowers v. State 209 Miss. 86, 41 So.2d 352 (1949), cert. denied, 339 U.S. 946, 70 S.Ct. 800, 94 L.Ed. 1360 (1950); Ferrell v. State, 208 Miss. 539, 45 So.2d 127 (1950); Seay v. State, 212 Miss. 712, 55 So.2d 430 (1951); Durr v. State, 214 Miss. 658, 59 So.2d 304 (1952); Wheeler v. State, 219

Miss. 129, 63 So.2d 517, cert. denied, 346 U. S. 852, 74 S.Ct. 67, 98 L.Ed. 367 (1953); Johnson v. State, 223 Miss. 56, 76 So.2d 841, cert. denied, 349 U.S. 946, 75 S.Ct. 874, 99 L.Ed. 1272 (1955); Walker v. State, 229 Miss. 540, 91 So.2d 548 (1956); Cameron v. State, 233 Miss. 404, 102 So.2d 355 (1958); Kennard v. State, 242 Miss. 691, 128 So.2d 572, cert. denied, 368 U.S. 869, 82 S.Ct. 111, 7 L.Ed.2d 66 (1961); Gordon v. State, 243 Miss. 750, 140 So.2d 88 (1962); Wilson v. State, 243 Miss. 859, 140 So.2d 275 (1962); Harper v. State, 251 Miss. 699, 171 So.2d 129 (1965) (trial occurred on March 11, 1963).

The reports further indicate that in the years immediately succeeding petitioner's plea such challenges were even more frequent. Moreover, it is practically certain the number of times such challenges or the active use of the leverage of such a position by defense counsel took place in unreported trial court situations is much, much greater. For example, the Mississippi Supreme Court, in refusing Goldsby's state court collateral attack on his conviction, noted that counsel for one of Goldsby's codefendants timely made such a challenge to the grand jury. Goldsby v. State, 226 Miss. 1, 86 So. 2d 27, 31 (1956).

See Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1011 n. 102 (1970). Without intimating any opinion as to whether these fundamental rights may ever be waived by an attorney for his client, it is sufficient for the purposes of this case to point out that the right to be indicted or tried by a constitutionally composed jury is not one of the rights traditionally considered so inherently personal that only the defendant may waive it. In United States ex rel. Goldsby v. Harpole, *supra,* this court stated:

> The evidence in this case . . . fairly considered shows no waiver by the appellant himself but at most by his counsel without his express authority. In ordinary procedural matters, the defendant in a criminal case is bound by the acts or nonaction of his counsel. That might extend to the waiver of the objection that Negroes were systematically excluded from the grand jury. In noncapital cases, it might extend to a like waiver as to the petit jury. *It might extend to such a waiver even in capital cases, where the record affirmatively shows that the particular jury was desired by defendant's counsel after conscientious consideration of that course of action which would be best for the client's cause.*

263 F.2d at 83 (footnotes omitted) (emphasis added).

In Whitus v. Balkcom, *supra,* noted with approval in Henry v. Mississippi, *supra,* 379 U.S. at 451–452, 85 S.Ct. at 569, we quoted the language of *Goldsby* and stated that in the circumstances described there could be a "true waiver based on a free option." 333 F.2d at 502.

In Cobb v. Balkcom, 339 F.2d 95 (5th Cir. 1964), there was no evidence of any deliberate bypass by counsel for the defendant. The court properly held that the lawyer's statement that he was satisfied with the jury was insufficient to show an intent to waive a right to achieve a strategic advantage. The court specifically pointed out that "[w]e are not presented here with a waiver case where a 'particular jury was desired by defendant's counsel after conscientious consideration of that course of action which would be best for his client's cause,' see United States ex rel. Goldsby v. Harpole, *supra.*" 339 F.2d at 101 n. 2.

Finally, United States ex rel. Seals v. Wiman, 304 F.2d 53 (5th Cir. 1962) involved a situation where the evidence on which to base the constitutional claim was unknown to the defendant or his counsel at the original trial, and was not easily ascertainable. Since the evidence was not available it was held that there could be no deliberate bypass. *See* 304 F.2d at 69. *See also* Whitus v. Balkcom, *supra,* 333 F.2d at 502.

■ This court thus does no more than adhere to its established rule that a constitutional objection to the composition of a grand or petit jury may be waived by an attorney without consultation with his client where there is "conscientious consideration of that course of action which would be best for his client's cause."

■ *Waiver by Guilty Plea*—In addition to the attorney's valid waiver of the jury discrimination claim, there is an alternative basis for our holding that such a claim could not provide a basis for habeas relief in this case. Since the original panel decision in this cause the Supreme Court has made it manifestly clear that Winters' guilty plea is a complete bar to habeas relief grounded on grand jury discrimination. Tollett v. Henderson, *supra.* There the court, relying on McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970), and Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), stated that "respondent's guilty plea here . . . forcloses independent inquiry into the claim of discrimination in the selection of the grand jury." 411 U.S. at 266, 93 S.Ct. at 1607. *Tollett*

requires this court to reject Winters' petition for relief based on his jury discrimination claim if we find that his guilty plea was voluntary and intelligent and that he was afforded effective counsel. We turn next to those issues.

### The Validity of the Guilty Plea

 *Knowledge of Every Possible Constitutional Right is Not Required*—Petitioner grounds his attack on the voluntary and understanding character of his guilty plea by arguing that he was never advised that he had a right to object to the systematic exclusion of Negroes from the grand jury that indicted him and from the petit jury which would have tried him had he gone to trial. This in itself, however, is not enough to render his plea invalid. As the Supreme Court stated in Tollett v. Henderson, *supra*:

> . A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry. . .

> The principal value of counsel to the accused in a criminal prosecution often lies not in counsel's ability to recite a list of possible defenses in the abstract, nor in his ability, if time permitted, to amass a large quantum of factual data and inform the defendant of it. Counsel's concern is the faithful representation of the interest of his client and such representation frequently involves highly practical considerations as well as specialized knowledge of the law.

411 U.S. at 267, 93 S.Ct. at 1608.

Just as McMann v. Richardson, *supra*, stands for the proposition that habeas corpus relief is not ipso facto available where counsel has given erroneous advice to his client who pleads guilty as a result thereof, similarly a federal habeas court will not intervene where the attorney merely failed to inform his client of a single possible constitutional claim which he thought best to use as a coin for barter with the prosecution. Where the attorney reached a more than arguably correct decision involving many complicated and uncertain variables, we will not impose a rule requiring that he inform his client as to the precise nature of each variable. A lawyer does not have to conduct a course in constitutional law for his client to validly discharge his position of trust.

Winters may not attack the voluntary and intelligent character of his guilty plea by pointing to his counsel's failure to discuss either his existing right to challenge the racial composition of the grand jury or his potential right to challenge any unconstitutionally constituted petit jury in the event he determined to go to trial. The character of the plea may be challenged only by petitioners showing that his counsel's advice was not "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, *supra*; Tollett v. Henderson, *supra*.

 *The Effectiveness of Winters' Counsel*—We have no doubt that the advice Winters received from his counsel met the standards of McMann. Winters predicates his ineffective counsel claim both on the failure of his retained counsel to advise him of his constitutional right to challenge the jury composition and on a more general claim that the attorney did not devote the necessary time, energy, and interest to petitioner's defense.

The merits of the more specific charge—the failure to inform Winters of his right to challenge the grand jury —have been amply dealt with in the earlier portion of the opinion. Suffice it to say that, just as an attorney's failure to consult with his client does not necessarily vitiate the attorney's waiver of a constitutionally protected right, an attorney's failure to consult with his client on every possible constitutional claim does not constitute ineffective counsel.

Winters' more general claim of ineffective counsel is settled by the district court's conclusion that the claim was not founded in fact.

[The attorney] interviewed petitioner at the Holmes County Jail promptly upon being employed and prior to the arraignment. This could not have been more than five days after the employment, and was probably less. After interviewing petitioner, the attorney promptly undertook such investigation as in his judgment was required. He then sought a mental examination of petitioner in order to determine whether or not the defense of insanity would be available. He conferred not only with petitioner, but with members of his family and with the state's attorneys on numerous occasions. He was fully aware of all of petitioner's rights, but was also aware of the almost overwhelming evidence against petitioner. His devotion to petitioner's cause is amply demonstrated by the evidence.

. . . The facts surrounding the death of Branch as related to [the attorney] by petitioner presented a clear case of murder under Mississippi law. [The attorney's] conferences with members of petitioner's family confirmed that petitioner had given his family the same version of the facts. It should also be remembered that certain unidentified members of petitioner's family were present at the scene of the killing. It is not unreasonable to assume that those members of petitioner's family told what they knew either to [the attorney] or to the other members of the family. It is sig-nificant that [the attorney's] interviews with the family produced no conflicts with the version of the facts related to [the attorney] by petitioner. [The attorney's] conversations with the state's attorneys further confirmed petitioner's version of the facts. There is nothing before this court to indicate that even if [the attorney] had interviewed other witnesses he would have learned anything different from what he was told by petitioner, petitioner's family and the state's attorneys. It is possible, indeed likely, that some attorneys in the same circumstances might have interviewed other witnesses. However, in the absence of a showing that [the attorney's] failure to interview such witnesses resulted in his being unaware of available evidence which could have been used to the benefit of petitioner, the court is of the opinion that such failure did not render [the attorney's] assistance to petitioner ineffective.

333 F.Supp. at 1040–1041.

Finally, even in the calm of retrospect we do not fault counsel's advice that Winters should plead guilty in exchange for a lesser penalty. Lawyers worth their salt acutely feel the oppressive weight of professional responsibility when it must carry the stake of human life. If the jury exclusion claim had been successfully asserted, it would have at most only postponed the day of the final judgment. On the facts of this case, we cannot say any able defense lawyer would have made or should have allowed a client to make a different decision.[4] Even ig-

---

4. I take this opportunity to correct a confusing error in footnote 2 to my dissent to the original panel decision in this case, 466 F.2d at 1399. The footnote should conclude "it is not inappropriate to note that in *Goldsby* and [other] of the cases examined, the defense was effectively raised, but the defendant was eventually executed after retrial with a proper jury. A Pyrrhic victory indeed." (Corrected word in brackets.) This reference to Goldsby's execution and the execution of several of those more-than-twenty referred to in that footnote who initially raised their jury claim in the state courts was not intended to fault the *Goldsby* court's reasoning by hindsight. It merely suggests that no one can quarrel with the forceful truth forecast by the results of those cases had Winters' attorney chosen to submit his case to a jury in order to formally raise the constitutional claim. A motion won is a poor exchange for a client's life lost.

noring the racial overtones which the dissenters emphasize as so important to this time and place for procedural purposes, Winters' exchange of a lethal shotgun blast for a prior verbal insult and a fisticuff makes his lawyer's trade of a term of imprisonment which could be as short as ten years for the chance to gamble on the death sentence look like a sure thing. But conceding *arguendo*, that the attorney was mistaken in his decision not to attack the jury composition, surely that judgment was well "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, *supra*.

The judgment of the district court is Affirmed.

RIVES, Senior Circuit Judge, dissenting, with whom JOHN R. BROWN, Chief Judge, concurs in part, and GOLDBERG, Circuit Judge, concurs:

With deference I dissent and adhere to the majority holding of the original panel (466 F.2d 1393 at 1397) reversing and remanding this case for an evidentiary hearing on the issue of whether Negroes were in fact systematically excluded from grand *and petit juries* in Holmes County, Mississippi, at the time of Winters' indictment and conviction.

I respectfully submit:

(1) that the unilateral action of his counsel does *not* bar Winters from seeking relief based on systematic exclusion of Negroes from either the grand or petit jury;

(2) that Winters' guilty plea was *not* voluntary and intelligent;

(3) that Winters was *not* furnished effective assistance of counsel;

(4) that *Goldsby* (263 F.2d 71) should remain fully applicable in jurisdictions like Holmes County, Mississippi.

The four issues just outlined are so overlapping and mutually interlocking that they can best be discussed together.

The population of Holmes County, Mississippi, is about 70% black and 30% white. We, of course, take judicial notice of the census figures.[1] According to the 1960 Census, Holmes County had 2218 white males and 3913 nonwhite males (Winters' habeas petition averred that 99% of those listed nonwhite were Negroes). According to the 1970 Census, Holmes County had a total population of 23,120 of which 15,743 were Negroes, 68% of the total. Thus, for every seven Negroes there were approximately three white persons in Holmes County. Yet Winters' federal habeas petition averred that "at the time of the indictment of the petitioner, either no Negroes or only a very small percent had ever been on the jury list." (App. p. 8.) At each step of his postconviction proceedings in the state court and in the federal court, Winters has consistently attacked the petit jury array as well as the grand jury composition (see App. pp. 4, 6, 7, 11 to 16). He has never had an opportunity to prove that Negroes were in fact systematically excluded from either the grand jury or the petit jury. This appeal should be decided upon the assumption that, if afforded that opportunity, Winters might be able to prove the truthfulness of his averments.

Certainly this Court cannot proceed on the assumption upon which Winters' attorney acted; namely, that the racial composition of the jury made no difference. "I have always assumed that jurors try the facts." (App. p. 90, see also App. pp. 86–87.) For the Court to proceed upon such an assumption would be wholly unrealistic and would amount to holding unnecessary all of that long line of jurisprudence forbidding systematic exclusion of persons from jury serv-

---

1. *United States* v. *Gottfried*, 2nd Cir. 1948, 165 F.2d 360, 363, cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139, reh. denied, 333 U.S. 883, 68 S.Ct. 910, 92 L.Ed. 1157; 22A C.J.S. Criminal Law § 541(2), p. 258.

ice because of their race. Indeed, Mr. Crawley misconceived his role as an advocate for Winters as opposed to that of amicus curiae.[2]

The racial composition of the juries, grand and petit, was of utmost importance because the case literally shrieks with racial overtones. Branch, a middle-aged white man with a bad reputation in the community, severely slapped Winters, an 18-year-old Negro, because Winters talked to a Negro girl employee in Branch's beer joint. Infuriated by the slap, Winters left the beer joint, drove to get a shotgun, and returned to kill Branch.[3]

Perhaps we can better envision the case if in our mind's eye we picture it as one in which the races of the parties are reversed. That is to say, a middle-aged black man with a bad reputation in the community runs a beer joint in which he employs a white girl. A white boy, 18 years old, undertakes to talk to the girl and the black man severely slaps the white boy. The white boy, infuriated by the slap, leaves the beer joint, drives to get a shotgun, and returns to kill the black man. Would any member of this Court be so certain that the white boy would suffer the death penalty unless he entered a bargained plea for a life sentence? Would it be certain that the white boy would be indicted for murder? Would it be fair for that white boy to be indicted for murder by an all-black grand jury and to be tried before an all-black petit jury with whites systematically excluded from jury service? Certainly not. Before this Court, Winters stands on an equal footing with that white boy. Each is entitled to a trial before a jury of his peers from which members of his race have not been systematically excluded.

There could scarcely exist a clearer or more extreme case in which an attorney undertook to act unilaterally, without consulting or advising his client as to his rights or as to the pertinent facts to be considered in reaching a decision to plead guilty or not guilty. That is shown by the following express and detailed findings of fact made by Judge Keady, the federal district judge; quoted in the margin.[4]

2. See Ellis v. United States, 1958, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060; Anders v. California, 1967, 386 U.S. 738, 744, 745, 87 S.Ct. 1396, 18 L.Ed.2d 493; Entsminger v. Iowa, 1967, 386 U.S. 748, 751, 87 S.Ct. 1402, 18 L.Ed.2d 501.

3. The only evidentiary hearing was that in the state trial court on Winters' motion to vacate, and the only evidence as to the facts and circumstances of the killing was the hearsay testimony of Mr. Crawley as to what Winters had told him. Mr. Crawley testified to different, if not inconsistent, versions on direct examination (App. 81, 82) and on re-direct examination (App. 97). Judge Keady adopted the latter version: "A total distance of approximately 40 miles had been traveled from the beer joint to the friend's house and back" (333 F.Supp. 1037). Forty miles travel by automobile would probably consume less than an hour in time. Under Mississippi law, it would be for the jury to say whether there had been sufficient time for cooling of Winters' feelings of outrage to furnish the "malice aforethought" essential for a conviction of murder, and consequently whether the crime amounted to murder or manslaughter. In a case where the state of agitation extended from Monday night until Wednesday afternoon, the Mississippi Supreme Court said: "There is no fixed period of time for cooling. Whether there has been time for cooling and malice engendered depends upon the circumstances, and sometimes upon the temperament of the defendant on trial." Haley v. State, 1920, 123 Miss. 87, 85 So. 129, 132. Title 11, § 2226 of the Mississippi Code states that, "The killing of another in the heat of passion, without malice, by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter."

4. "Mr. Crawley was aware of petitioner's right to attack the exclusion of Negroes from the grand jury which indicted him and from the petit jury impaneled for the October term of the Circuit Court of Holmes County . . .." 333 F.Supp. 1038.

"He [Mr. Crawley] did not advise petitioner's family of petitioner's right to challenge the racial composition of the juries." 333 F.Supp. 1038.

"At no time did Mr. Crawley advise petitioner that he had a right to challenge the racial composition of either the grand jury or the petit jury." 333 F.Supp. 1039.

However well-intentioned he may have been, Mr. Crawley wholly misconceived his role as attorney for Winters. In reaching a decision to change his plea to guilty and accept life imprisonment as punishment, Winters was entitled to the *advice* of his attorney, not to his virtual *dictation*. Mr. Crawley simply had no right or authority to assume the ultimate responsibility for Winters' destiny.

Winters was not lacking in intelligence. That is readily demonstrated from reading his testimony before the state trial judge at the hearing of his motion to vacate (App. 59–78). Judge Keady found as a fact that, "Although lacking in formal education, petitioner was intelligent and capable of normal understanding." (333 F.Supp. 1036).

The right and responsibility to reach the ultimate decision as to pleading guilty or not rested squarely upon the shoulders of Winters himself. Winters was denied that right.

In Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1110, the author states:

"Any attempt to devise a waiver rule independent of the allocation of authority between attorney and client in the trial court is doomed to failure. The waiver question requires a determination as to which of the two may act authoritatively in the proceedings looking to a final judgment of guilt or innocence."

In a classic affirmation of the need for the defendant's personal participation in a significant by-pass decision, the Supreme Court stated in Fay v. Noia, 1962, 372 U.S. 391, 438–439, 83 S. Ct. 822, 849, 9 L.Ed.2d 837:

". . . We therefore hold that the federal habeas judge may in his discretion deny relief to an applicant who has *deliberately by-passed* the orderly procedure of the state courts.
. . .

"But we wish to make very clear that this grant of discretion is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus. The classic definition of waiver enunciated in Johnson v.

"At no time did either petitioner's attorney or the state court advise petitioner of his right to challenge the racial composition of either the grand or petit juries, and petitioner was not aware of that right." 333 F.Supp. 1040.

"An apt illustration of Mr. Crawley's view of his duties and responsibilities as petitioner's defense counsel is the following excerpt from the cross-examination of Mr. Crawley by petitioner's attorney in the evidentiary hearing held on the motion to vacate sentence in the Circuit Court of Holmes County:

" 'Q. You did not file a motion to quash the indictment prior to arraignment?

" 'A. No, I did not.

" 'Q. Did it occur to you that under Mississippi law, you might have waived the defendant's right to object on the grounds of systematic exclusion of Negroes as jurors?

" 'A. I was aware that any motion must be filed before arraignment. I was also aware that in view of the seriousness of the constitutional questions that could be raised, that it would be reversible error for the court to overrule the motion, probably. "Mr. Fitzgerald," the supreme thing in my mind at the time was saving this man's life. I felt then and now that I must do and did do at that time all I could to save this man from the death penalty.

" 'Q. Were you concerned with whether or not you were making the decisions your client would have made?

" 'A. Well, insofar as making decisions are concerned, I accepted the responsibility of this man's destiny when I accepted employment. I was representing him to the best of my ability, and I cannot say I would have allowed him to make any decision which I felt would put his life in jeopardy. Before I could do that, I would have asked the court to allow me to withdraw, I could not knowingly allow him to make a decision which would put his life in jeopardy.

" 'Q. But it went a little deeper than that because you did not inform him of what his rights were, did you, as to the composition of the jury?

" 'A. Insofar as his constitutional rights with regard to the composition of the Grand and Petit Juries, I did not discuss that with him, as I say, I was more concerned with saving this man's life than anything else.' " 333 F.Supp. 1039 n. 4.

Zerbst, 304 U.S. 458, 464 [58 S.Ct. 1019, 82 L.Ed. 1461]—'an intentional relinquishment or abandonment of a known right or privilege'—furnishes *the controlling standard* . . . At all events we wish it clearly understood that the standard here put forth depends on the *considered choice of the petitioner* . . . . A choice made by counsel not participated in by the petitioner *does not automatically bar relief."* (Emphasis added.)

The clear mandate of the *Noia* standard is that the defendant must personally participate in the by-pass decision. The admonition in the last sentence does little to undermine the strength of the standard dictated by the entire paragraph.

The key question is to what extent, if any, does Henry v. Mississippi, 1965, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408, limit the broad language of *Noia* emphasizing the need for defendant's personal participation in the by-pass decision.

The majority recognizes, as it must, that after *Henry* there are instances where a defendant's personal waiver is required. According to the majority, those instances fall into two categories: First, where there is evidence of incompetence on the part of the defendant's attorney; and, second, where an inherently personal right of fundamental importance is involved.

In the original panel opinion, the majority held that Winters' guilty plea was not intelligently entered and, hence, any waiver incorporated in that plea was ineffective. That holding rendered academic the issue of Crawley's right to independently waive Winters' potential jury objection. I adhere to the view that Winters' conviction should be reversed on the ground that his guilty plea was constitutionally invalid, but assum-

ing arguendo that the plea was competent, I would hold, in contrast to the majority, that the right to racially nondiscriminatory grand and petit juries is so important as to require a personal waiver.

The majority's rhetorical statements that "We refuse to enlarge the attorney's duty to include the responsibility to inform the defendant of every possible constitutional claim" and "A lawyer does not have to conduct a course in constitutional law for his client to validly discharge his position of trust" tend to obscure the real issue involved—whether the constitutional right to racially nondiscriminatory grand and petit juries is one of those paramount rights which must be personally waived by the defendant.

For almost a century the Supreme Court has consistently held that "a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded. . . ." Whitus v. Georgia, 1966, 385 U.S. 545, 549, 87 S. Ct. 643, 646, 17 L.Ed.2d 599.[5] In view of the Supreme Court's emphatic sustained confirmation of the constitutional. right to racially nondiscriminatory grand and petit juries, I submit that that right is far too important to be taken out of the defendant's hands.

The majority places great weight upon the following language in *Henry, supra* at 451–452, 85 S.Ct. 564, 569:

"Although trial strategy adopted by counsel without prior consultation with an accused will not, where the circumstances are exceptional, preclude the accused from asserting constitutional claims, see Whitus v. Balkcom, 333 F.2d 496 (5th Cir. 1964), we think that the deliberate by-passing by counsel of the contemporaneous-objection rule as a part of trial strate-

5. See also Strauder v. West Virginia, 1879, 100 U.S. 303, 25 L.Ed. 664; Pierre v. Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Peters v. Kiff, 1972, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83; Alexan-

der v. Louisiana, 1972, 405 U.S. 625, 92 S. Ct. 1221, 31 L.Ed.2d 536; where the Court stressed the importance of a racially balanced grand jury, independent of the petit jury issue.

gy would have that effect in this case."

In spite of the Supreme Court's explicit reference to Whitus v. Balkcom as an example of "exceptional circumstances," the majority concludes that the present case does not fall within the "exceptional circumstances" portion of the *Henry* rule.[6] With that conclusion, I categorically disagree.

In Whitus v. Balkcom, this Court recognized the "Hobson's choice" imposed upon both a black defendant and his white attorney in jurisdictions with a history of racial segregation and an all-white jury system:

"But the burden is exceptionally heavy when the life and liberty of an accused depend on the weight to be given something as imponderable as the extent of the additional anti-Negro reaction that would be engendered by attacking the all-white jury system. As if this were not sufficiently difficult, there is the intolerable complication that the reaction against an attorney who raises the exclusion issue may stretch from persiflage to ostracism."

*Whitus, supra,* 333 F.2d at 505, 506. Thus, there are two Hobson's choices—one faced by the black defendant and the other by his white attorney. The majority ignores completely the constitutionally impermissible choice forced upon the black defendant, ruling only on the issue of the attorney's Hobson's choice:

". . . the majority of the court en banc now announces that it does not consider such breach of trust by counsel [referring to the judicial notice taken in Goldsby v. Harpole that southern lawyers rarely raise the issue of systematic exclusion of Negroes from juries] to be so prevalent in any jurisdiction of this circuit that this court should, in the absence of proof, place all or even some lawyers in this circuit under the cloud of such an accusation."

Assuming that the majority's prospective overruling of *Goldsby* and disclaimer of any "Hobson's choice" facing modern southern lawyers is correct (a conclusion I do not accept),[7] the principal

---

6. It is important to note that *Henry* involved a situation requiring an immediate courtroom decision. The logical conclusion to be drawn from the facts in *Henry* is that *Henry* eliminates the requirement of personal participation only as to decisions involving ongoing courtroom tactics. This interpretation is buttressed by the fact that *Henry* made no mention of limiting *Noia*, and Mr. Justice Brennan wrote both opinions. *Noia* involved a nontrial issue—the right to appeal, whereas *Henry* involved a trial issue—admission of a police officer's damaging testimony. This case falls within that class involving nontrial strategy to which the *Noia* mandate applies.

In Brookhart v. Janis, 1966, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314, a habeas case, decided during the term following *Henry*, the Supreme Court found that the petitioner's alleged waiver of the right to cross-examine witnesses by agreeing to let the state prove merely a prima facie case did not meet the standards of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, since petitioner obviously did not appreciate the significance of counsel's agreement to accept proof of a "prima facie" case. In holding that petitioner's right to confrontation could not be waived by counsel, the Court found "nothing in *Henry*" that could "possibly support" a contrary result. Winters, like the petitioner in *Brookhart*, gave up his right to trial and confrontation by succumbing to a bargain (struck by counsel) whose significance Winters did not appreciate. In *Brookhart*, as in *Noia* and *Winters*, there was time for the attorney to advise his client; a *Henry*-type courtroom tactical decision was not involved.

7. In order to reach the conclusion that the second leg of the *Whitus* holding is now incorrect, the majority finds it necessary to prospectively repudiate this Court's statement in *Goldsby* that,

"As Judges of a Circuit comprising six states of the deep South, we think that it is our duty to take judicial notice that lawyers residing in many southern jurisdictions rarely, almost to the point of never, raise the issue of systematic exclusion of Negroes from juries." (263 F.2d at 82.)

That quotation was lifted out of context. The quotation had been preceded by a long paragraph showing the prejudicial effect on the defendant himself caused by raising the

Hobson's choice—that imposed upon the black defendant himself—which was recognized in *Goldsby* (see 263 F.2d 82) and formed the heart of the Court's reasoning in *Whitus*—certainly faced Winters in Holmes County, Mississippi in 1963. The key to the holding in *Goldsby* and in *Whitus,* the unconstitutional burden shouldered by the accused, endures as an "exceptional circumstance" specifically recognized by the Supreme Court in *Henry.* The probity of the black defendant's white attorney, the issue with which the majority is preoccupied, is irrelevant to the central thrust of the "exceptional circumstances" rule. Even assuming that the waiver of the constitutional claim is calculated to benefit the defendant, if the advantage to be gained by the waiver is the avoidance of improper racial prejudice, then the attorney's decision will not bind the defendant.[8]

To obviate what appears to me to be mistaken reliance by the majority on Tollett v. Henderson, 1973, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235, I quote the conclusion reached by Mr. Justice Rehnquist:

"We thus reaffirm the principle recognized in the *Brady* trilogy: a guilty

---

issue. See Goldsby v. Harpole, 263 F.2d at 82.

The judicial notice taken in *Goldsby* was judicial notice of a legislative fact, not an adjudicative fact, see Judicial Notice, 55 Colum.L.Rev. 945 (1955); K. Davis, Administrative Law Treatise § 15.03 (1958); Note, 72 Yale L.J. 559 (1963); and as a crucial link in the Court's reasoning process, it was perfectly proper. The majority's citation of Mississippi Supreme Court decisions which involved jury discrimination objections made prior to *Goldsby* does not undermine the fact that in *many* southern jurisdictions such objections were *rare.* Happily the number of such jurisdictions is now much less, but in predominantly Negro jurisdictions like Holmes County, Mississippi, the battle has not been won.

A few quotations from cases decided in this Circuit will reveal actual testimony supporting the position taken in *Goldsby.*

Winters' attorney, Mr. Crawley, testified that although he has represented many Negro defendants,

"He had *never* filed such a challenge himself, but knew of *one* case in which a white attorney had challenged the composition of a jury on racial grounds in Kosciusko, without adverse social or economic effects." (Emphasis added.) 333 F.Supp. at 1037.

"Honorable Carl Booth, who had been the State prosecuting attorney in Mobile since 1943, testified that *no motion* based on the exclusion of Negroes from the grand jury or the petit jury had ever been made prior to Seals' trial . . . ." (Emphasis added.) U. S. ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 68.

"Mr. Johnson, the attorney who represented Seals on his trial, testified that he had defended many other Negroes for capital crimes, somewhere between fifteen and fifty, but that he never had a Negro as one of the jurors in a capital case in which a Negro was a defendant. He had *never* attacked the composition of a jury on the ground that Negroes were systematically excluded." (Emphasis added.) U. S. ex rel. Seals v. Wiman, 304 F.2d at 68.

"The evidence adduced in support of the petition included sworn statements of the sheriff and ·deputy clerk of the Superior Court of Jasper County, who had held their positions, respectively, for 21 and 30 years, that no Negroes had ever served on a grand or traverse jury in the county during the past 30 years . . . .. These officials stated also that they had *never* heard counsel for a Negro defendant in a criminal case *raise any constitutional objection to the composition of a jury* panel from which the names of grand and traverse jurors were drawn." (Emphasis added.) Cobb v. Balkcom, 5 Cir. 1964, 339 F.2d 95, 98.

"The affidavit of Cobb's trial counsel showed that he had been a member of the Georgia Bar since 1934; that he had defended many Negroes charged with felonies in the county, and that he had *never* seen a Negro serving on a traverse jury in the county. He stated that he had *never* raised the issue of a systematic exclusion of Negroes from juries . . . .." (Emphasis added.) Cobb v. Balkcom, 339 F.2d at 98.

Here is the sworn testimony of southern lawyers and county officials with personal experience in cases involving Negro defendants. None of them remember more than *one time* when a white lawyer raised the issue of systematic exclusion for a Negro client.

8. Henry v. Mississippi, *supra;* Whitus v. Balkcom, *supra.* See Federal Habeas Corpus: The Import of the Failure to Assert a Constitutional Claim at Trial, 58 Va.L.Rev. 67 (Jan.1972).

plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*." 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235, 243.

Thus the issue is now precisely drawn: When Winters pleaded guilty, was the advice he received from counsel "within the range of competence demanded of attorneys in criminal cases"? I submit that that question should be answered in the negative.

Winters was ignorant both as to the constitutional invalidity of the indictment and as to his prospects for a fair trial before a jury of his peers from which members of his race were not systematically excluded. Mr. Crawley was fully aware of Winter's rights and of their prospective violation in a trial on the merits, but he failed completely to give Winters any advice whatsoever on the subject. Thus Winters was denied effective assistance of counsel.

Mr. Justice Rehnquist pointed out that in the *Brady* trilogy the facts giving rise to the constitutional claims were generally known both to the defendants and to their attorneys prior to the entry of the guilty pleas, and that in *Tollett* such facts were unknown both to the defendant and to his attorney. Here the facts were known to Mr. Crawley but they were not known to Winters. This case differs from both the *Brady* trilogy and *Tollett* in that here the defendant's attorney was under a positive duty to advise the defendant of his constitutional rights and that in the absence of objection those rights would be violated. Mr. Crawley completely, indeed deliberately, failed to give Winters any such advice. Thus Winters was denied effective assistance of counsel.

Further, it is plain error for a trial court to accept a plea of guilty without an affirmative showing that the defendant himself intelligently and voluntarily entered his plea. Boykin v. Alabama, 1969, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274. "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin, supra*, 395 U.S. at 243–244, 89 S.Ct. 1709, 1712. The voluntariness of the plea "can be determined only by considering all of the relevant circumstances surrounding it." Brady v. United States, 1970, 397 U.S. 742, 749, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747. A plea of guilty waives the defendant's constitutional right to trial. Such a waiver not only must be voluntary but must be a knowing, intelligent act done with "awareness of the relevant circumstances and likely consequences." The defendant must have an opportunity to make "an intelligent assessment of the relative advantages of pleading guilty," *Brady, supra*, 397 U.S. at 748 n. 6, 90 S.Ct. at 1469, and to "rationally weigh the advantages of going to trial against the advantages of pleading guilty," *Brady, supra*, 397 U.S. at 750, 90 S.Ct. at 1470.

From the record in this case, one must conclude that Winters' attorney refrained from giving him any advice as to Winters' right to challenge the racial composition of both the grand jury and the trial jury. Being ignorant of such matters, and with his attorney deliberately failing to give him any pertinent advice, it was simply impossible for Winters to make an intelligent choice to change his plea from not guilty to guilty.

I conclude that Winters' guilty plea was not valid; he was not furnished effective assistance of counsel; the unilateral action of his counsel was not a waiver by Winters; *Goldsby* should remain fully applicable in jurisdictions like Holmes County, Mississippi.

I respectfully dissent.

GODBOLD, Circuit Judge, dissenting, with whom JOHN R. BROWN, Chief Judge, and WISDOM, Circuit Judge, concur:

The Supreme Court, in Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), recognized that under exceptional circumstances trial strategy adopted by counsel without prior consultation with the accused will not preclude the accused from later constitutional claims. In the opinion for the Court Justice Brennan cited the decision of this circuit in Whitus v. Balkcom, 333 F.2d 496 (5th Cir., 1964), as an example of "exceptional circumstances." 379 U. S. at 451, 85 S.Ct. at 569, 13 L.Ed.2d at 415. In *Whitus,* Judge Wisdom's opinion for this court had addressed itself to, inter alia, the "Hobson's choice" imposed upon the white attorney for a black defendant in places where as a consequence of past practices of segregation there has been an all-white jury system. 333 F.2d at 505–509. The teaching of *Whitus* in this respect is not that an attorney who does not question the racial composition of the jury is necessarily lacking in competence or is failing to conscientiously represent his client. Rather it is that the defendant is prejudiced in a constitutional sense when his counsel, however, able and conscientious, is presented with such a "Hobson's choice." [1]

In this case I do not fault counsel nor do I question the bona fides of his conclusion that the case against his client was such that he considered the racial composition of the jury to be immaterial. But those considerations do not solve the constitutional issue. To cite the conclusion conscientiously made by counsel who knows the facts about the jury system, or to conclude that faced with the possibility of a "Hobson's choice" he secured a good plea bargain for his client, is no answer to the principle that the constitution forbids that the choice be injected into the case in the first instance.

The majority opinion gives lip service to the interplay of *Henry* and *Whitus* but undercuts it. There can be little doubt that Holmes County is a place where as a consequence of past practices there has been racial exclusion of Negroes from juries. Winters' counsel, on the scene, recognized this [2] and elected to employ it as a lever in plea bargaining. I do not understand the majority to deny the past history of racial exclusion but rather to confess and avoid. One prong of the avoidance is that viewed in retrospect Winters' counsel made effective use of the very deficiency of which Winters now complains. The difficulty with this approach—that Winters really got a "good deal" and ought not to complain—is that had Winters been informed of the racial exclusion point he might have elected to stand on it and take his chances before a properly constituted jury. While we do not know, he just might have been acquitted or convicted of some lesser offense. He was deprived of participation in the decision as to what election to make, and that deprivation cannot be cured by the subsequent reaction of judges that, considering all, he came out remarkably well.

The theory, asserted to avoid *Whitus,* that as to the petit jury Winters' attorney never faced the "cruel choice" because he made a plea bargain before a trial court convened, will not stand ex-

---

1. *Whitus* also discussed the "Hobson's choice" imposed directly upon the accused himself. I have focused upon the matter primarily through the eyes of counsel, but that is not to be construed as overlooking the impact directly upon the accused himself.

2. If it was not a "fact" in the ultimate sense there was at least sufficiently high probability of its being a fact that counsel sought to capitalize upon it.

amination. The possible assertion of racial composition of Holmes County juries was the springboard for plea bargaining. The matter of whether—and how—racial composition would be raised if no plea bargain was agreed upon necessarily was a factor in counsel's decisional process. The ultimate moment of truth never came, but it would have arisen had there been no plea bargain. The "Hobson's choice" may not be inflicted either in the courtroom at trial or ahead of trial as a factor necessarily part and parcel of plea bargining.

The second prong of the majority's confession and avoidance is to conclude that this is not an "exceptional circumstance" case within Henry v. Mississippi. Necessarily my brothers must draw the teeth of Justice Brennan's reference in *Henry* to *Whitus* as an example of "exceptional circumstances." In *Whitus*, a waiver-by-counsel case, there was a history of racial exclusion of Negroes from juries to which was applied the "judicial notice" rule of Goldsby v. Harpole, 263 F.2d 71 (5th Cir.), cert. denied, 361 U.S. 850, 80 S.Ct. 109, 4 L.Ed.2d 89 (1959). The majority in the present case, therefore, recede from *Goldsby* and would require the client whose right to object to racial composition of a jury has been waived by his counsel, to prove that in waiving without the client's consent the attorney failed in his obligation. (Presumably there would be failure of obligation if it could be shown that the attorney was unwilling to raise the issue of racial exclusion or that the possibility of having to raise the issue was a significant factor in the plea bargaining process.)

The majority do not say that *Goldsby* was wrong *ab initio*. Indeed a group of judges none of whom was on this court in 1959, and most of them not even on the bench, are hardly in position to say that JJ. Rives, Brown (now Chief Judge) and Wisdom, erred in 1959 in considering particular subject matter to be of such general currency at that time as to be accepted as true without proof. The principle then established in *Golds-*

*by* was not one of universal application but rather by its own terms was limited to "many jurisdictions." It is possible that in some places where past segregation practices once commanded the application of *Whitus-Goldsby* time and change have so erased history that the choice—faced by counsel knowing the facts—of whether to attack the racial composition of the jury is no longer a choice between the lesser of two evils. But it is for the state to prove by objective facts that the particular jurisdiction is not one of the "many jurisdictions" in which *Goldsby* applies. That was not done here. It strikes me as inappropriate to wipe out an established rule having specialized application throughout the range of a giant six-state circuit by means of a sweeping pronouncement in a case in which the concern is racial exclusion in a single county in one state, and to do this without objective facts.

The defendant in this case pleaded guilty, while the defendants in *Henry* and *Whitus* had been found guilty after trial. The majority opinion refers to Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), holding that a state criminal defendant who had pleaded guilty could not thereafter raise by federal habeas corpus a claim of racially-related infirmity in the grand jury selection process. In *Tollett* the Court stated that the counselled defendant who has entered a guilty plea "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann* [McMann v. Richardson, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 25 L.Ed.2d 763, 773 (1970), which stated that the test is whether the advice was within the range of competence demanded of attorneys in criminal cases]." But in *Tollett* neither the petitioner nor his counsel knew how the grand jury had been selected or that Negroes were systematically excluded. 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d at 239. Tollett's complaint was not that his attorney had

been faced with an unconstitutional "Hobson's choice" but rather that he had failed to make diligent inquiry to ascertain the facts concerning racial exclusion, an issue which the court left open to be determined on remand under *McMann* standards. It seems to me that *Tollett* has no application to the situation where counsel *does* know of the all-white jury system and is thrust eyeball-to-eyeball against the cruel choice described in *Whitus*.

One of the reasons that the "Hobson's choice" of *Whitus* was an "exceptional circumstance" under *Henry* is the risk that against a background of historical exclusion of blacks from the jury the white attorney will fail to confer with and advise his black client about attacking the system, or, if the attorney does confer with him, that the advice may be colored by counsel's fear of harm to his client's cause or his concern (conscious or unconscious) for his own status in the community. *Whitus, supra,* 333 F. 2d at 505–506. It makes no sense to apply *McMann's* standards of competence to a situation with respect to which the Supreme Court has recognized that the

risks to the defendant are independent of counsel's competence. Thus, the *Whitus-Henry* combination remains viable where—or, more specifically, at the very least where—the complaint is not that counsel does not know enough but that he knows so much that the risks to his client are too great.

JOHN R. BROWN, Chief Judge (dissenting):

As one of the original panel, I adhere to reversal. I therefore dissent, but I think we should have put this result on the ground of *Whitus–Henry* exceptional circumstances which Judge Godbold so well articulates in his dissent in which I join. I also join in Judge Rives' opinion as to this ground. This ground is so clear to me that I do not have to consider the other grounds argued by Judge Rives for reversal.

For such a "Hobson's choice" minimal assistance requires that the lawyer counsel with the accused, carefully and fully explaining the legal issues and the choices open. The choice may still be a "Hobson's choice", but the choice is that of the accused, not that of the lawyer.